## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES,                          )
                                        )
v.                                      )          Criminal Action No. 04-114-9 (RBW)
                                        )
RODRIGO TOVAR PUPO,                     )
                                        )
            Defendant.                  )
                                        )

## MEMORANDUM OPINION

The defendant in this criminal matter, Rodrigo Tovar Pupo, pleaded guilty to one count

of conspiring to manufacture and distribute five or more kilograms of cocaine, with the intent or

knowledge that the cocaine would be imported into the United States. March 21, 2014

Evidentiary Hearing, Government Exhibit ("Gov't Ex.") 2 (July 22, 2009 Plea Agreement

("Agreement")) at 1. Currently before the Court is the defendant's motion to withdraw his guilty

plea, Defendant's Motion to Withdraw His Plea ("Def.'s Mot."); Defendant's Renewed Motion

to Withdraw Guilty Plea ("Def.'s Renewed Mot."), which is opposed by the government,

Government's Opposition to Defendant's Motion to Withdraw His Plea ("Gov't Opp'n");

[Government's] Response to Renewed Motion to Withdraw Guilty Plea ("Gov't Resp."). Upon

careful consideration of the parties' submissions,[1] as well as the evidence presented to the Court

---

[1] In addition to the filings already mentioned, the Court considered the following documents in rendering its decision: (1) Defendant Rodrigo Tovar Pupo's Supplemental Submission in Support of His Renewed Motion to Withdraw Guilty Plea ("Supp'l Submission"); (2) Defendant Rodrigo Tovar Pupo's Reply Memorandum in Support of His Renewed Motion to Withdraw Guilty Plea ("Def.'s Reply"); (3) Defendant Rodrigo Tovar Pupo's Supplemental Memorandum of Authorities ("Def.'s Supp'l Mem. I"); (4) the [First] Supplemental Submission of Authority ("Gov't Supp'l Submission I"); (5) Defendant Rodrigo Tovar Pupo's Reply to Government's Supplemental Submission of Authority ("Def's Reply to Gov't Supp'l Submission I"); (6) Defendant Rodrigo Tovar Pupo's May 2, 2014 Post-Hearing Supplemental Memorandum ("Def.'s Supp'l Mem. II"); (7) the Second Supplemental Submission of Authority ("Gov't Supp'l Submission II"); (8) the March 26, 2009 Conflicts Hearing Transcript ("Conflicts Hr'g Tr."); and (9) the July 22, 2009 Plea Hearing Transcript ("Plea Hr'g Tr.").

during an evidentiary hearing conducted over several days, the Court denies the defendant's

motion to withdraw his guilty plea for the reasons that follow.

## I.    BACKGROUND

Sometime in 1997, the United Self-Defense Forces of Columbia—a "federation of right-

wing, . . . paramilitary-style groups"—came into existence in Colombia and "under[took]

responsibility for protecting Colombian citizens from left-wing[,] guerilla organizations" seeking

to "overthrow . . . the Colombian government." March 21, 2014 Evidentiary Hearing, Gov't Ex.

3 (Statement of Facts ("Statement")) ¶ 2.  In 1999, the defendant became the leader of one of

these paramilitary-style groups, which identified itself as the "Bloque Norte." Id. ¶ 3.  By the

time the defendant assumed his leadership position, the Bloque Norte had already "acquire[d]

land and power, including social, political[,] and military influence, in large parts of northeastern

Colombia." Id. ¶ 5.  In early 2002, the Bloque Norte's influence continued to expand, see id., as

it merged with a like-minded right-wing group known as the Self-Defense Forces of the

Campesinos of Magdalena and Guajira, which controlled other areas along the northern coast of

Colombia. ¶¶ 1, 5.  "This new group was called the Tayrona Resistance Front (as well as the

Bloque Norte), and was led by," among others, the defendant. Id. ¶ 5.  The areas controlled by

the Tayrona Resistance Front/Bloque Norte were used by other individuals to "grow[], process[],

manufactur[e], and transport[]" cocaine. Id. ¶ 6.  The cocaine would be "transported to beaches

[along] the north[ern] coast of Colombia," id., where it would then be shipped to "destinations in

the Caribbean, Central America[,] and Mexico," id. ¶ 7.  After arriving at these destinations, the

cocaine was then shipped again to other locations, including the United States. Id.

In order for the Tayrona Resistance Front/Bloque Norte to fund its anti-guerilla

operations, it "implemented a policy of taxing [the] participants in the cocaine production and

distribution process." Id. ¶ 3. As a leader of the Tayrona Resistance Front/Bloque Norte, the

defendant was in charge of "implement[ing]" these war taxes. Id. ¶ 6; see also id. ¶ 8 ("[T]he

defendant . . . [was] involved in the taxation of drug traffickers who utilized the coastal area to

launch numerous drug shipments . . . ultimately destined for the United States."). And "[i]n

exchange for these taxes, the [Tayrona Resistance Front/Bloque Norte] provided security for the

drug traffickers—thereby ensuring that the traffickers were not confronted by left-wing guerilla

groups or other criminal elements." Id. ¶ 9. As a leader of the Tayrona Resistance Front/Bloque

Norte:

> [T]he defendant came to learn . . . that large quantities of cocaine, amounting to
> more than 1,500 kilograms, either transited through or were manufactured in the
> [group]'s area of control and were subject to taxation; that in exchange for receipt
> of the taxes, the laboratories where the cocaine was manufactured were allowed to
> operate and cocaine that was transiting through the area was allowed to pass, and
> that both activities were provided protection from insurgent groups and other
> criminal elements and that once the cocaine that was manufactured in and
> transited through his area of control left Colombia, the cocaine traveled to places
> outside of Colombia, . . . including the United States.

Id. ¶ 10.

Following his arrest, the defendant was extradited to the United States on or about May

13, 2008. See, e.g., April 7, 2014 Evidentiary Hearing Transcript ("Apr. 7, 2014 Hr'g Tr.") at

89:21-90:3 ("All the defendants that were extradited came in on May 13th, 2008 . . . ."); see also

March 20, 2014 Evidentiary Hearing Transcript ("Mar. 20, 2014 Hr'g Tr.") at 196:24-197:3.

Thereafter, the defendant retained Joaquin Perez as his defense counsel.[2] E.g., March 19, 2014

Evidentiary Hearing Transcript ("Mar. 19, 2014 Hr'g Tr.") at 33:4-10. On March 26, 2009, the

Court conducted a hearing, see Fed. R. Crim. P. 44(c); Conflicts Hr'g Tr. at 1-12, to ascertain

---

[2] The defendant also retained Heather Shaner. March 19, 2014 Evidentiary Hearing Transcript ("Mar. 19, 2014 Hr'g Tr.") at 23:9-11, 24:14-25. Her actual representation of the defendant has no bearing on the Court's decision.

whether the defendant intended to retain Mr. Perez, notwithstanding any potential conflicts of interest that may arise as a result of Mr. Perez's representation of one of two codefendants,[3] Hughes Rodriguez-Fuentes and Salvatore Mancuso, being prosecuted by the government in connection with the unlawful importation of cocaine from Colombia into the United States. See Mar. 20, 2014 Hr'g Tr. at 154:24-156:2. By this time, defendants Rodriguez-Fuentes and Mancuso had already pleaded guilty and agreed to cooperate with the government, including potentially testifying against the defendant, if the defendant decided to exercise his right to a trial. See Mar. 20, 2014 Hr'g Tr. at 154:24-156:2; Conflicts Hr'g Tr. at 3:14-4:1, 8:4-24. At the conclusion of the conflicts hearing, the Court determined that the defendant fully appreciated the potential conflicts associated with Mr. Perez's joint representation of codefendants and that he knowingly and voluntarily had waived his right to conflict-free counsel. See Conflicts Hr'g Tr. at 7:20-23, 12:5-12. The Court then held a plea hearing on July 22, 2009, where, after the defendant had an opportunity to consider the government's factual proffer for the crime for which he was charged, the defendant pleaded guilty to one count of a conspiracy to manufacture and distribute cocaine with the intent or knowledge that the cocaine would be imported into the United States in violation of 18 U.S.C. § 2 (2006) and 21 U.S.C. §§ 959, 960, 963 (2006). See generally Plea Hr'g Tr. (conducting plea hearing pursuant to Federal Rule of Criminal Procedure 11); see also March 21, 2014 Evidentiary Hearing, Gov't Ex. 2 (Plea Agreement ("Agreement")) ¶ 1. Almost two years after entering the guilty plea, on June 30, 2011, the defendant moved to withdraw his plea, seeking to exercise his right to a trial on the conspiracy charge. See Def.'s

---

[3] Prior to the conflicts hearing, the Court had only been aware of Mr. Perez's representation of codefendant Rodriguez-Fuentes. The Court learned at the hearing, however, that Mr. Perez was also representing Salvatore Mancuso, whose criminal matter was related to the defendant's case, but was before another member of this Court. See Conflicts Hr'g Tr. at 7:24-12:1. For the purposes of this motion, the Court will refer to them both as codefendants.

Mot. at 1-3. However, on March 22, 2013, the defendant withdrew his motion, but then later renewed it on January 23, 2014. See Def.'s Renewed Mot. at 1. The government opposes the defendant's motion.

## II.    LEGAL ANALYSIS

Federal Rule of Criminal Procedure 11 permits a defendant who has entered a guilty plea and is pending sentencing to withdraw the plea if "the defendant can show a fair and just reason for requesting the withdrawal." Fed. R. Crim. P. 11(d)(2)(B). The "'permission to withdraw rests in the sound discretion of the trial court.'" United States v. Horne, 987 F.2d 833, 837 (D.C. Cir. 1993) (quoting United States v. Davis, 617 F.2d 677, 685 (D.C. Cir. 1979)). The Court considers three factors in evaluating whether it should allow the defendant to withdraw the guilty plea: "(1) whether the defendant has asserted a viable claim of innocence; (2) whether the delay between the guilty plea and the motion to withdraw has substantially prejudiced the government's ability to prosecute the case; and (3) whether the guilty plea was somehow tainted." United States v. Hanson, 339 F.3d 983, 988 (D.C. Cir. 2003) (internal quotations omitted). The Court will consider the factors "in the order of their importance," United States v. Jones, 642 F.3d 1151, 1156 (D.C. Cir. 2011), beginning with the third factor, as that is "the most important" one, United States v. Tolson, 372 F. Supp. 2d 1, 9 (D.D.C. 2005) (citing Horne, 987 F.2d at 837), aff'd, 264 F. App'x 2 (D.C. Cir. 2008).

### A. Whether the Guilty Plea Was Tainted

#### 1. Existence of an Actual Conflict of Interest

A guilty plea is tainted if it "either failed to conform to the requirements of Federal Rule of Criminal Procedure 11 or was in some other sense constitutionally deficient." Tolson, 372 F. Supp. 2d at 9 (internal citations omitted). The District of Columbia Circuit "has made clear that

'a defendant who fails to show some error under Rule 11 has to shoulder an extremely heavy

burden if he is ultimately to prevail' on a withdrawal motion." Id. at 10 (quoting United States v.

Cray, 47 F.3d 1203, 1208 (D.C. Cir. 1995)).  The heavy burden of demonstrating that the

defendant's guilty plea was constitutionally deficient can be satisfied if the defendant received

"ineffective assistance of counsel, a deficiency that can render [the guilty] plea involuntary."

United States v. Berkeley, 567 F.3d 703, 708 (D.C. Cir. 2009).  To substantiate a defendant's

claim of ineffective assistance of counsel, the defendant must show: "that counsel's performance

was deficient" and "that the deficient performance prejudiced the defense." United States v.

Curry, 494 F.3d 1124, 1129 (D.C. Cir. 2007) (quoting Strickland v. Washington, 466 U.S. 668,

687 (1984)).  "Where, as here, the ineffective-assistance claim" is allegedly a result of "defense

counsel's deficient performance result[ing] from a conflict of interest," the defendant "may avoid

the burden of demonstrating prejudice." Tolson, 372 F. Supp. 2d at 12 (citing United States v.

Gantt, 140 F.3d 249, 254 (D.C. Cir. 1998)).  Prejudice is "more easily satisfied" in the context of

joint representation because counsel "cannot serve [multiple] clients adequately" when they have

"opposing interests." United States v. Taylor, 139 F.3d 924, 930 (D.C. Cir. 1998) (internal

quotations omitted).  For that reason, the defendant need only show that "'an actual conflict of

interest adversely affected his lawyer's performance.'" Id. (quoting Cuyler v. Sullivan, 446 U.S.

335, 348 (1980)).

    At the outset of the Court's analysis of the defendant's motion to withdraw his guilty

plea, it is important to note that the defendant concedes that the Court conducted the plea hearing

in conformity with Federal Rule of Criminal Procedure 11, and thus he shoulders the extremely

heavy burden of showing that his counsel labored under an actual conflict that affected his legal

representation. See Cray, 47 F.3d at 1208; see also Tolson, 372 F. Supp. 2d at 24 ("Again, the

general interest of the legal system in finality in the plea process militates strongly against allowing the withdrawal of a guilty plea, where the Court finds no defect in the procedure by which it was entered, absent the most compelling of circumstances indicating the innocence of the defendant."). Here, although the defendant's counsel likely had an actual conflict of interest in advising the defendant to accept the guilty plea, the conflict did <u>not</u> adversely affect counsel's representation of the defendant.

An actual conflict of interest exists if the defendant's counsel "advanced his own, or another client's, interest to the detriment of the defendant." <u>Taylor</u>, 139 F.3d at 930; <u>see also</u> <u>Holloway v. Arkansas</u>, 435 U.S. 475, 490 (1978) ("[I]n a case of joint representation of conflicting interests the evil—it bears repeating—is in what the advocate finds himself compelled to <u>refrain</u> from doing, not only at trial but also as to pretrial plea negotiations and in the sentencing process." (emphasis in original)); <u>United States v. Harris</u>, 846 F. Supp. 121, 127 (D.D.C. 1994) ("An actual conflict of interest exists 'when, during the course of the representation, the attorney's and defendant's interests 'diverge with respect to a material factual or legal issue or to a course of action.'" (quoting <u>Winkler v. Keane</u>, 7 F.3d 304, 307 (2d Cir. 1993))).

The evidence here sufficiently demonstrates that Mr. Perez had an actual conflict of interest in representing two other codefendants, who had already agreed to provide cooperation to the government, while at the same time advising the defendant to plead guilty. <u>See Harris</u>, 846 F. Supp. at 127 n.11 ("Almost all inadequate representation claims due to conflicts of interest arise in multiple representation settings."). As noted already, in the course of Mr. Perez's representation of the defendant, he also served as counsel for two other codefendants who both allegedly had information regarding the cocaine conspiracy charged against the

7

defendant. Mar. 20, 2014 Hr'g Tr. at 154:24-155:5; see also Apr. 7, 2014 Hr'g Tr. at 99:10-100:3. Although counsel's representation of multiple codefendants is not necessarily a violation of the defendant's constitutional right to effective assistance of counsel, see Holloway, 435 U.S. at 482 ("permitting a single attorney to represent codefendants . . . is not per se violative of constitutional guarantees of effective assistance of counsel"), here Mr. Perez found himself in the rare situation of simultaneously representing multiple defendants with conflicting interests. During the course of advising the defendant to accept the government's plea offer, the other codefendants represented by Mr. Perez had already entered guilty pleas, with agreements to cooperate with the government, see Mar. 20, 2014 Hr'g Tr. at 154:24-156:2; Conflicts Hr'g Tr. at 3:14-4:1, 8:4-24, including assisting in the government's case against the defendant, Conflicts Hr'g Tr. at 3:14-4:1 (Rodriguez-Fuentes was a "definite possibility" for a witness at trial); id. at 9:20-10:10 (Mancuso was a "potential witness" at trial). Because the cooperation agreements with the codefendants could result in sentencing benefits to the codefendants, Mr. Perez had a duty to safeguard those potential benefits, even at the expense of the defendant's right to have a trial, as doing so was conceivably in the codefendants' best interests. See, e.g., United States v. Culverhouse, 507 F.3d 888, 893 (5th Cir. 2007) (opining that conflict would exist if counsel "pressured [the defendant] to plead guilty based on his desire to secure leniency for [the codefendant]"). In other words, it was arguably in the codefendants' best interests for the defendant to plead guilty and forego a trial. This possibility existed because if the codefendants testified in the defendant's trial in a manner unsatisfactory to the government, the codefendants risked losing the sentencing benefit from their cooperation agreements, as the government could decide to forego recommending to the Court lenient sentences for them. Thus, it is conceivable that Mr. Perez may not have been a zealous advocate for the defendant, as he may have had a

motive to dissuade the defendant from going to trial. See Apr. 7, 2014 Hr'g Tr. at 99:10-23 (Mr.

Perez explaining that he "never wanted" Mancuso to testify against the defendant at a trial). In

light of these incongruous interests between the codefendants and the defendant, Mr. Perez had

an actual conflict of interest when he advised the defendant to plead guilty.[4] See United States v.

Carlyle, 964 F. Supp. 8, 13 (D.D.C. 1997) ("The possibility that either of [counsel]'s clients

might agree to cooperate with the government, and in turn, have to testify against the other, is the

type of conflict that would make it difficult for [counsel] to effectively represent the best

interests of both clients.").

    The government posits that no actual conflict of interest likely existed because the

interests of the codefendants and the defendant were parallel, as the "best possible sentencing

benefit" that would have inured to the codefendants would have been if the defendant had gone

---

[4] The defendant advances two other unconvincing theories. First, he argues, in a somewhat convoluted manner, that his plea was tainted as a result of government misconduct by Robert Feitel, a former federal prosecutor in the Narcotics and Dangerous Drugs Section at the Department of Justice, even though he did not actually handle the defendant's case, and in the absence of any claim that he had any contact with the defendant before he entered the guilty plea. See Def.'s Mot. at 28-29. The defendant alleges that Mr. Feitel was "seriously considering" entering private practice when the defendant was considering the government's plea offer and that he communicated with Mr. Perez about the defendant's case at a time when he "saw [Mr.] P[erez] as a resource for him" if he entered private practice. Id. at 29. And, therefore, in an effort to take advantage of Mr. Perez's "great connections," the defendant hypothesizes that Mr. Feitel assisted Mr. Perez in "convincing [the defendant] to plead guilty." Id. The Court will not indulge the defendant's speculative reasoning because Mr. Feitel credibly testified that he was not involved in this case until well after the defendant pleaded guilty. See Apr. 7, 2014 Hr'g Tr. at 38:17-21, 41:14-23, 174:5-178:6; see also April 7, 2014 Evidentiary Hearing, Defendant's Ex. ("Def.'s Ex.") 47 (April 25, 2011 Letter from Retureta to Zeidenberg ("Apr. 25, 2011 Letter")) at 1 ("Mr. Feitel was not involved in any capacity with the prosecution of Mr. Tovar Pupo, and was absolutely not involved with Mr. Tovar Pupo's plea negotiations or guilty plea.").

    As for the defendant's contention that there "may have been a financial component that exacerbated Mr. Perez'[s] conflict of interest, since his disqualification prior to trial would have required him to refund at least part of the fees he had been paid," is without merit. Def.'s Supp'l Mem. II at 25. First, the defendant cites to nothing in the record that corroborates this contention. Second, in light of the fee arrangement acknowledged by the defendant, which would have paid Mr. Perez more for going to trial than what he received for negotiating the plea, see Mar. 19, 2014 Hr'g Tr. at 123:19-124:1 (testifying that he would have paid Mr. Perez $500,000 if his case went to trial); id. at 129:10-19 (testifying that he paid Mr. Perez about $390,000), it is unlikely that Mr. Perez prioritized his financial interest over the defendant's criminal interests, Gantt, 140 F.3d at 255 ("But the claim that Attorney X attempted to maximize his fee by encouraging [the defendant] to plead guilty makes no sense, because Attorney X presumably would have earned a larger fee if, rather than entering a guilty plea, [the defendant] had decided to proceed with a trial with Attorney X as his counsel.").

to trial and the codefendants testified against him.  Gov't Opp'n at 7; see also Gov't Resp. at 4

("Mancuso and Rodriguez[-Fuentes] . . . might have benefitted more had the defendant opted for

trial.").  But this position is misplaced, as it does not negate the proposition that there is at least

some benefit[5] to the codefendants in having the defendant plead guilty to ensure that they would

avoid potentially losing any cooperation credit from testifying in a manner that is not to the

government's liking.  And thus, the Court cannot rule out the likely scenario that Mr. Perez

labored under an actual conflict of interest when he advised the defendant to accept the guilty

plea.

### 2.  Waiver of the Conflict

Notwithstanding the existence of an actual conflict of interest, the government insists that

the defendant made a knowing and voluntary waiver of the conflict, and thus waived the right to

conflict-free counsel.  Although the law permits the defendant to waive the right to conflict-free

counsel, even in the face of an actual conflict, Wheat v. United States, 486 U.S. 153, 162 (1988)

("where a court justifiably finds an actual conflict of interest, there can be no doubt that it may

decline a proffer of waiver" (emphasis added)); Carlyle, 964 F. Supp. at 12 n.3 ("Even in the

case of an actual conflict, voluntary, knowing and intelligent waivers from both clients may

sufficiently cure the problem."); accord Fortson v. United States, 979 A.2d 643, 650 (D.C. 2009)

("Therefore, even where there is an actual conflict between the interests of the accused and those

of his attorney, a court may accept a defendant's waiver of his right to conflict-free counsel, to

preserve the defendant's right to be represented by counsel of choice."), as amended (Jan. 14,

---

[5]  The government implicitly concedes that a guilty plea from the defendant would result in some cooperation credit
to the codefendants.  See, e.g., Gov't Opp'n. at 7 (explaining that the codefendants would have a received "the best
possible sentencing benefit" if they testified at trial against the defendant).

2010), reh'g granted, opinion modified, 987 A.2d 1118 (D.C. 2010),[6] no knowing and voluntary

waiver occurred here with respect to the actual conflict despite the Court's painstaking attempt at

ensuring that the defendant fully understood the ramifications of waiving his constitutional right

to conflict-free counsel, see Harris, 846 F. Supp. at 130 ("[T]he degree of disclosure required to

meet the valid waiver standard is exceptionally high."). At the conflicts hearing, the Court only

explicitly explored and discussed potential conflicts with the defendant.[7] See generally Conflicts

Hr'g Tr. at 1-12. Thus, the Court did not apprise the defendant of the possibility of an actual

conflict that could arise during the plea-bargaining process. Accordingly, neither the Court nor

counsel for the parties clearly explained to the defendant the possibility that because of Mr.

Perez's representation of the codefendants, who had pleaded guilty and agreed to cooperate with

the government, that Mr. Perez could be incentivized on behalf of the codefendants, to pressure

the defendant into taking a guilty plea and foregoing trial.[8] See Culverhouse, 507 F.3d at 893.

---

[6] The case authority cited by the defendant does not hold that an actual conflict of interest can never be waived. Indeed, it holds to the contrary. See, e.g., United States v. Perez, 325 F.3d 115, 127 (2d Cir. 2003) ("In the multiple representation situation, the defendant 'can be advised by independent counsel of the dangers' of such matters as 'one defendant's cooperating with the government,' and make a knowing and intelligent decision that he wishes to continue to be represented by his attorney despite the attorney's representation of another accused." (quoting United States v. Fulton, 5 F.3d 605, 613 (2d Cir. 1993))); United States v. Schwarz, 283 F.3d 76, 95 (2d Cir. 2002) ("In most cases when a defendant is faced with a situation in which his attorney has an actual or potential conflict of interest, it is possible for him to waive his right to conflict-free counsel in order to retain the attorney of his choice. Where an actual or potential conflict has been validly waived, the waiver cannot be defeated simply because the conflict subsequently affects counsel's performance; such a result would eviscerate the very purpose of obtaining the waiver." (internal citations omitted)); Fulton, 5 F.3d at 612 ("When a lawyer's conflict, actual or potential, may result in inadequate representation of a defendant or jeopardize the federal court's institutional interest in the rendition of a just verdict, a trial judge has discretion to disqualify an attorney or decline a proffer of waiver."); Hoffman v. Leeke, 903 F.2d 280, 288 (4th Cir. 1990) (stating that "a trial court has broad latitude to permit or prohibit multiple representation," and denying waiver in a specific instance (internal quotations and citation omitted)).

[7] The defendant does not appear to assert that the conflict is a potential conflict. See Def.'s Reply at 1 ("What was presented here was not a potential conflict of interest.").

[8] In hindsight, the Court can now appreciate why it should have also advised the defendant that he had a right to conflict-free counsel regarding whether he should plead guilty. The Court is also disappointed and frustrated that experienced counsel for neither the government nor the defendant brought this conflict to its attention. Harris, 846 F. Supp. at 132 ("Counsel has an ethical obligation 'to avoid conflicting representations and to advise the court promptly when a conflict of interest arises' . . . [and] is in the best position to determine when a conflict exists or

(continued . . .)

Without being apprised of this conflict and "the precise manner in which [the defendant] might

be prejudiced by [Mr. Perez's] representation," Harris, 846 F. Supp. at 130 (internal alteration

and quotations omitted), the defendant could not have constitutionally waived his right to

conflict-free counsel, see Taylor, 139 F.3d at 931 & n.7 (explaining that the defendant can

knowingly and voluntarily waive claims of ineffective assistance based upon only those conflicts

that he knew or should have known about at the time the defendant agreed to waive the right to

conflict-free counsel); see also Campbell v. United States, 352 F.2d 359, 360 (D.C. Cir. 1965)

("When two or more defendants are represented by a single counsel, the District Court has a duty

to ascertain whether each defendant has an awareness of the potential risks of that course and

nevertheless has knowingly chosen it.").

### 3.  Impact of Actual Conflict

Despite the actual conflict of interest in this case, the defendant has not demonstrated that

this conflict adversely affected Mr. Perez's representation of him.  To demonstrate an adverse

impact resulting from the conflict, the defendant must establish "that the conflict had some

negative effect upon his defense (defined as an actual lapse in representation)." Gantt, 140 F.3d

at 254 (internal quotations omitted); see also Harris, 846 F. Supp. at 128 ("This lapse in

---

(. . . continued)
will develop as 'trial courts necessarily rely in large measure upon the good faith and good judgment' of . . .
counsel." (quoting Cuyler, 446 U.S. at 346-47)); see also Wheat, 486 U.S. at 159 ("[M]ultiple representation of
criminal defendants engenders special dangers of which a court must be aware.").

 Moreover, the government cites United States v. Lopesierra-Gutierrez, 708 F.3d 193, 202 (D.C. Cir.), cert.
denied, 134 S. Ct. 330 (2013), in support of its position that the defendant knowingly and voluntarily waived his
right to conflict-free attorney.  Admittedly, however, that case demonstrates that the Court's conflicts inquiry was
not as extensive as it needed to be in order for the Court to find that the defendant knowingly and voluntarily waived
his right to conflict-free counsel.  In Lopesierra-Gutierrez, unlike here, the district court: (1) appointed an
independent, conflict counsel for the defendant; (2) held "multiple" hearings on the issue of conflicts; (3) and
"emphasized" that the defendant "had a right to an attorney who lacked such . . . conflict[s]." Id.

representation adversely affecting the defendant's interests can be demonstrated not only by what the attorney does, but by what he refrains from doing." (internal quotations omitted)).

Here the defendant makes no serious attempt to explain how the presence of an actual conflict adversely affected Mr. Perez's representation of him. The defendant argues that the presence of an actual conflict necessarily leads to the conclusion that there was an adverse effect on his representation. See Def.'s Reply to Gov't Supp'l Submission I at 2. This is contrary to case authority, which requires a showing of both an actual conflict and an adverse effect traceable to the conflict. E.g., Gantt, 140 F.3d at 255 ("[The defendant]'s claim of ineffective assistance fails . . . because there is no showing of an actual conflict, nor is there any showing that any alleged conflict adversely affected [counsel]'s performance."); United States v. Bruce, 89 F.3d 886, 895 (D.C. Cir. 1996) ("[A] defendant must show not only that the attorney faced a conflict, but also that the conflict adversely affected his lawyer's performance." (internal quotations omitted)); Harris, 846 F. Supp. at 128 ("However, an actual conflict of interest is not enough for a presumption of prejudice.").

Based on the Court's Federal Rule of Criminal Procedure 11 colloquy with the defendant at his plea hearing, the Court cannot find that Mr. Perez's representation of the defendant was adversely affected by the existence of a conflict. See Tolson, 372 F. Supp. 2d at 19 ("[T]he criminal justice system must be able to rely on the . . . [Rule 11] dialogue between the court and the defendant. For this reason, in challenging a guilty plea on the basis of ineffective assistance, the representations of the defendant at the plea hearing as to the adequacy of counsel" can "constitute a formidable barrier to [the defendant's] later refutations." (internal citations, quotations, and ellipses omitted)). At the defendant's plea hearing, the defendant stated that he reviewed the plea documents with his attorney and understood what they meant. See Plea Hr'g

13

Tr. at 4:11-22, 5:6-6:8, 8:14-19.[9]  He knew the crime for which he had been indicted, and he

pleaded guilty to that offense:

> Q: . . . As to the charge in Count one of the indictment which charges conspiracy
> to manufacture and distribute [five] kilograms of more of cocaine[,] which is a
> Schedule II controlled substance, <u>knowing and intending that th[e] cocaine will be
> unlawfully imported into the United States</u>[,] which is a violation of Title 21 of
> the United States Code, Section[s] 963, 959[,] and 960, and 18 United States
> Code Section 2, how do you plead guilty or not guilty, sir?
>
> A: Guilty within my own responsibilities, Your Honor.

<u>Id.</u> at 50:12-20 (emphasis added); <u>see also</u> <u>id.</u> at 31:12-32:25.  The defendant voluntarily entered

this guilty plea and acknowledged that he was unequivocally satisfied with Mr. Perez's

representation:

> Q: . . . Has anybody threatened, forced[,] or coerced you to ether this plea of
> guilty?
> A: No, Your Honor.
> Q: And are you totally satisfied with the legal representation your lawyers have
> provided to you?
> A: That is correct, Your Honor.
> Q: [Do y]ou have any complaints whatsoever you'd like to make at this time
> regarding the quality of the representation your lawyers have provided to you?
> A: No, Your Honor, none.
> Q: And have you had an opportunity to fully discuss this case with your lawyers?
> A: Yes, Your Honor.
> Q: And who[se] decision is this to plead guilty, yours or your lawyer's?
> A: No, the decision is mine, Your Honor.
> Q: And knowing what you know about the government's case[,] do you think [the
> government] could prove that you're guilty if this case had to go to trial?
> A: Yes, Your Honor.
> Q: And do you think it's in your best interest to enter a plea of guilty?
> A: Yes, Your Honor.[10]

---

[9]  His admission during the Rule 11 colloquy that he reviewed and understood the plea paperwork, <u>see</u> Plea Hr'g Tr.
at 4:11-22, 5:6-6:8, 8:14-19, undermines any suggestion that he may not have properly reviewed the plea documents
prior to his acceptance of the government's plea offer, <u>see</u> Apr. 8, 2014 Hr'g Tr. at 221:5-222:23; Mar. 21, 2014
Hr'g Tr. at 267:17-268:7; Mar. 19, 2014 Hr'g Tr. at 114:11-116:3.

[10]  In light of this excerpted Rule 11 colloquy, the Court does not find credible the defendant's testimony during the
evidentiary hearing suggesting that his plea was involuntary because Mr. Perez pressured him into doing so.  <u>E.g.</u>,
Mar. 19, 2014 Hr'g Tr. at 82:14-19, 86:3-87:25, 105:12-25.  Notably, the defendant did not move to withdraw his
guilty plea until almost two years after the plea was entered.  <u>See</u> United States v. Barker, 514 F.2d 208, 222-23

(continued . . .)

. . .

> Q: [I]s there any other reason that you're pleading guilty other than because you
> are, in fact, guilty of the crime you're pleading guilty to?
> A: No, Your Honor[,] I want to take full responsibility for the crime that I committed
> before the American people and their justice system.

Id. at 48:8-49:5, 49:14-22.

Further dispelling any notion that the defendant was adversely affected by Mr. Perez's

representation is the fact that Mr. Perez was able to negotiate a favorable plea agreement with the

government in light of the government's evidence concerning the defendant's conspiracy charge.

See March 21, 2014 Evidentiary Hearing, Gov't Ex. 2 (Agreement) ¶ 2; Apr. 8, 2014 Hr'g Tr. at

264:2-267:12 (prosecutor's representations concerning the evidence the government had against

the defendant); Government's Motion for Pretrial Detention at 2-3, United States v. Pupo, No.

04-cr-114-9(RBW) (D.D.C. May 15, 2008), ECF No. 124 ("The evidence against the defendant[]

consists of seizures of cocaine, surveillance, Colombian court-authorized intercepted telephone

conversations in Colombia, and cooperating and/or government witnesses."). The plea

agreement allowed the defendant to "receive a three-level reduction in his offense level for

acceptance of responsibility" under the sentencing guidelines. Gov't Opp'n at 9 n.2; see also

March 21, 2014 Evidentiary Hearing, Gov't Ex. 2 (Agreement) ¶ 13. It also included a

cooperation agreement, whereby the defendant was eligible to receive an additional sentence

reduction in return for his cooperation with the government. See March 21, 2014 Evidentiary

---

(. . . continued)
(D.C. Cir. 1975) (suggesting that the Court can consider the delay in filing a motion to withdraw a guilty plea in deciding whether to grant the motion); United States v. McKoy, 645 F.2d 1037, 1038-39 (D.C. Cir. 1981). It appears that the impetus for the defendant's pending motion is merely his regret for entering an agreement that implicates him as a drug trafficker, which he fears would tarnish—in his eyes—the favorable reputation he established through his paramilitary activities in Colombia. Apr. 8, 2014 Hr'g Tr. at 229:8-16, 231:23-232:3, 264:2-25; Mar. 19, 2014 Hr'g Tr. at 37:20-22, 38:2-3; cf. McKoy, 645 F.2d at 1038 (recognizing that the "justifications asserted [by the defendant] for withdrawing the plea" were nothing more than "post hoc explanations").

Hearing, Gov't Ex. 2 (Agreement) ¶ 14; Plea Hr'g Tr. at 19:16-21; see also Tolson, 372 F. Supp. 2d at 16 (reasoning that "[a]ctive pursuit of a plea agreement including a cooperation provision" supports an inference that the defendant received effective assistance from counsel). Neither of these beneficial provisions in the plea agreement would have been available to the defendant if he went to trial and was found guilty of the cocaine conspiracy charge. The Court's Rule 11 colloquy with the defendant,[11] coupled with the favorable plea deal Mr. Perez acquired for the defendant, leads the Court to conclude there was no adverse impact resulting from the actual conflict of interest. Accordingly, the most important factor in the Court's consideration of the withdrawal motion swings in favor of the government.

## B. Whether the Defendant Has a Viable Claim of Innocence

The defendant insists that he is innocent of the charged conspiracy because "[t]he mere taxation of illegal narcotics trafficking does not in itself constitute membership in a narcotics conspiracy," Def.'s Mot. at 30, and that constructive knowledge that cocaine from Columbia made its way into the United States is insufficient to satisfy the importation statute to which he pleaded guilty, id. at 31.[12] These arguments are without merit. Importantly, any viable claim of

---

[11] To the extent the defendant argues that the lapse in representation was Mr. Perez's unwillingness to take the defendant's case to trial, that argument is undermined by not only his knowing and voluntarily waiver of his right to a speedy trial, see Plea Hr'g Tr. at 42:8-46:6 (waiving right to trial), but also record evidence indicating that he was not absolutely adamant about going to trial, see, e.g., March 20, 2014 Evidentiary Hearing, Def.'s Ex. 20 (June 2, 2009 Email from Iriarte to Perez ("June 2, 2009 Email")) at 2 ("I am sending you again the corrections to the Statement of Facts dated 5.29.09 . . . to see if we can find a compromise that might make me desist from going to trial."). And as the Court will explain, trial was not in the best interest of the defendant, as he did not have a viable claim of innocence.

[12] The statute prohibiting unlawful importation of cocaine into the United States has "extraterritorial scope" and the defendant's cocaine conspiracy in Colombia falls within the purview of the statute. See Morales v. United States, 933 F. Supp. 2d 82, 84 (D.D.C. 2013). Moreover, the defendant appears to concede that he had constructive knowledge that the cocaine he subjected to "war taxes" made its way to the United States. See Def.'s Mot. at 31 (attacking basis of plea on ground that conspiracy statute requires "actual . . . knowledge" and not "constructive knowledge").

Finally, it appears that the defendant now has difficulty accepting responsibility for his conduct because of a disconnect between what he believes constitutes a narcotics conspiracy and what the law requires for a narcotics

(continued . . .)

innocence is belied by the Court's Rule 11 colloquy with the defendant. See United States v.

Shah, 453 F.3d 520, 523 (D.C. Cir. 2006) ("A 'motion that can succeed only if the defendant

committed perjury at the plea proceedings may be rejected out of hand unless the defendant has a

compelling explanation for the contradiction.'" (quoting United States v. Peterson, 414 F.3d 825,

827 (7th Cir. 2005)). At the beginning of the colloquy, the Court placed the defendant under

oath. See Plea Hr'g Tr. at 3:10-23 (acknowledgment that his responses to the Court's questions,

being made while under oath, could be used against him at some later point in time in a

prosecution for perjury or making a false statement). The defendant thereafter communicated to

the Court that he had reviewed the plea documents with his attorney and understood their

contents. See Plea Hr'g Tr. at 4:11-22, 5:6-6:8. The Court subsequently reviewed the elements

of the charged offense with the defendant. Id. at 31:12-32:25. The Court asked the defendant if

he had signed the six-page Statement of Facts because it was "true and accurate," and the

defendant responded "yes." Id. at 7:18-8:8. The government then recited the Statement of Facts,

which provided the predicate for the defendant's guilty plea, for his consideration. Id. at 33:1-

40:15. And with the exception of the proper spelling of an acronym, which the parties ultimately

corrected, the defendant did not object to the truth and accuracy of these facts. Id. at 40:17-

41:13; see also id. at 7:18-8:8 (acknowledgement by the defendant that the Statement of Facts is

"true and accurate"); Gov't Ex. 2 (Agreement) at 6 (signing plea agreement and attesting to truth

---

(. . . continued)

conspiracy. See, e.g., March 20, 2014 Evidentiary Hearing, Def.'s Ex. 20 (June 2, 2009 Email) at 2 ("I will not . . . turn the structures of the Bloque Norte that were under my command into a drug trafficking organization, although I was not unaware that four of the sixteen Fronts that I formed were financed in part by taxes levied on the different drug trafficking schemes that existed in the region. But that does not turn us into drug traffickers, when the history of the region recognizes that it was us who defeated the guerillas that had taken root there."); Mar. 19, 2014 Hr'g Tr. at 46:3-16. Although the defendant may not have thought of the Bloque Norte as a drug trafficking organization, his characterization is irrelevant as to whether he is innocent under the relevant criminal statutes to which he pleaded guilty.

and accuracy of Statement of Facts). Thus, in entering the guilty plea, the defendant fully

appreciated the elements of the crime for which he had been indicted and his conduct that led to

the indictment.

Further, the basis of the defendant's claim of innocence appears to be a denial of

involvement. E.g., Def.'s Reply, Affirmation of Rodrigo Tovar Pupo ("Pupo Affirmation") ¶ 21

("I maintain that I have not violated any [U.S.] laws and that I am innocent."). But a guilty plea

cannot be withdrawn merely because the defendant denies involvement in the charged crime.

See United States v. West, 392 F.3d 450, 456 (D.C. Cir. 2004) ("A general denial of guilt is not

enough[.]"); McKoy, 645 F.2d at 1039; Tolson, 372 F. Supp. 2d at 25 (explaining that

"withdrawal motions will be granted on evidence of actual innocence alone only when that

evidence is of the most compelling sort," but that "mere recantations of earlier admissions of

guilt" are not compelling).

Moreover, the defendant's alleged involvement in the conspiracy is not merely limited to

his taxation of cocaine trafficking activities as he suggests. See Def.'s Mot. at 30. Rather, the

defendant's criminal conduct also included leading the paramilitary group, the Tayrona

Resistance Front/Bloque Norte, that provided security detail for those Colombians involved in

cocaine trafficking activities along the northern coast of Colombia, which facilitated the

shipment of some of the cocaine into the United States. See, e.g., March 21, 2014 Evidentiary

Hearing, Gov't Ex. 3 (Statement) ¶ 10 (summarizing the defendant's criminal conduct).

And lastly, the defendant had the requisite intent to be charged with the cocaine

conspiracy, as he "came to learn . . . that . . . the cocaine traveled to places outside of Colombia, .

. . including the United States." Id.; see also id. at 6 (defendant signing Statement of Facts and

admitting "involvement in a conspiracy to manufacture and distribute five kilograms or more of

cocaine, <u>intending and knowing</u> that such cocaine would be unlawfully imported into the United States" (emphasis added)); Plea Hr'g Tr. at 50:12-20 (pleading guilty to "conspiracy to manufacture and distribute [five] kilograms or more of cocaine, <u>knowing and intending</u> that that cocaine will be unlawfully imported into the United States" (emphasis added)); Apr. 8, 2014 Hr'g Tr. at 264:2-25 (federal prosecutor representing that "[the defendant] clearly understood how the drug trade worked in that area"); <u>id.</u> at 266:6-267:12 (federal prosecutor representing that "[the defendant] acknowledged knowing generally that cocaine from Colombia was going to the U.S."); Apr. 7, 2014 Hr'g Tr. at 196:24-197:6; <u>Lopesierra-Gutierrez</u>, 708 F.3d at 197-98, 206 (the defendant's "awareness that at least some of the cocaine he conspired to distribute would be imported into the United States" provides sufficient <u>mens rea</u> to support a charge of conspiracy to distribute cocaine with the knowledge or intent that it would be imported to the United States); <u>United States v. Asaifi</u>, No. 04-cr-401-02(RMC), 2007 WL 1322098, at *10 (D.D.C. May 3, 2007) (the defendant's "claim of actual innocence rest[ed] on the theory that he was unaware that the smuggled immigrants were destined for the United States" was undermined by the government's factual proffer at the plea hearing, which the defendant admitted as true and accurate). In short, the facts proffered by the government are sufficient to support the conspiracy charge filed against the defendant.[13] <u>See, e.g.</u>, Plea Hr'g Tr. at 33:1-41:13; March 21, 2014 Evidentiary Hearing, Gov't Ex. 3 (Statement) at 1-6; <u>see also</u> Def.'s Mot., Ex. C at 1 (letter from the defendant to prior attorney stating: "I may be a conspirator in an activity related to drug trafficking insofar as 70% of Colombians have knowledge that drugs are produced,

---

[13]  The defendant's citation to <u>United States v. McCoy</u>, 215 F.3d 102, 107 (D.C. Cir. 2000), is unavailing.  First, that case concerned a different statute than the statutes that form the predicate of the defendant's guilty plea here.  And second, the defendant in <u>McCoy</u> denied having the requisite specific intent for the conspiracy charge, 215 F.3d at 107, whereas here, because the defendant admitted when he entered his guilty plea that he had an "awareness that at least some of the cocaine" was ultimately imported into the United States, <u>Lopesierra-Gutierrez</u>, 708 F.3d at 197-98, 206, he had sufficient intent to support the conspiracy charge.

commercialized, taxed (as it were) and exported from Colombia to the consumer markets around the world including the United States of America.  In my particular case, I kn[ew] it from about the age of fifteen when I was in high school; it was talked about everywhere.  I may also be a conspirator from the standpoint of a government proxy on a certain territory where the illicit narcotics trade is practiced with the consent of all existing authorities in the country. . . . [A]nd as a figure of authority on that territory[,] I did not combat the production, sale[,] and transportation of drugs within the same territory and the exportation to international markets undertaken by drug traffickers in exchange for tax payments that allowed us to obtain the resources necessary to fight our war against the armed forces of communism—which attacked us as people, as society, and as a nation.").  The Court, therefore, finds that this factor weighs in favor of the government, as there is no objectively reasonable defense from which the defendant could escape criminal liability.  See Jones, 642 F.3d at 1158.

### C.  Whether the Government Will be Prejudiced

In assessing whether the government will be prejudiced by a defendant's motion to withdraw a guilty plea, the Court must consider whether the delay between the defendant's guilty plea and the subsequent motion to withdraw will "substantially prejudice[] the government's ability to prosecute the [defendant's] case."  Id. at 1159.  The Court will not belabor this point, as it has never been a dispositive factor in determining whether the motion to withdraw should be granted.  Id.  Here, this factor, like the others, tilts in favor of the government—albeit slightly— as some of the witnesses that the government would call to testify at the defendant's trial, pursuant to their cooperation agreements with the government, have already served their prison sentences and have now been deported to Colombia, thus potentially making them unavailable as government witnesses.  See Gov't Opp'n at 21-22; Gov't Resp. at 11-12.  Although the

government conceded that it cannot definitively assert that the witnesses will not be available, there is also no guarantee that their testimony, either live or otherwise, can be procured by the government for trial. Moreover, even if the deported witnesses agreed to testify in some manner, their memories of the events about which they would testify have likely faded to some extent with the passage of time, resulting from the defendant's almost two-year delay before he first sought to withdraw his guilty plea.

### III.   CONCLUSION

For the foregoing reasons, the Court will deny the defendant's motion to withdraw his guilty plea.[14]

**SO ORDERED** on this 18th day of November, 2014.

REGGIE B. WALTON
United States District Judge

---

[14] The Court has contemporaneously issued an Order consistent with this Memorandum Opinion.