IN THE UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v.                                     ) | Case No. 04-114-09-RBW |
| ) | |
| RODRIGO TOVAR PUPO,        ) | |
| ) | |
| Defendant.                       ) | |

## DEFENDANT TOVAR PUPO'S MEMORANDUM IN AID OF SENTENCING

Defendant Rodrigo Tovar Pupo, through undersigned counsel, respectfully submits this memorandum in aid of sentencing

### Introduction

This Court has adjudicated many cases that are in the "heartland" of narcotics trafficking cases  These cases involve individuals who are intentionally engaged in the production, sale, and trafficking of narcotics to the United States for personal profit  This case is as far outside the heartland of such cases as could be imagined

Mr Tovar Pupo's supervision of the imposition of taxes is the basis for the government's theory that he was engaged in a narcotics trafficking conspiracy  As has been conceded, Mr Tovar Pupo assessed taxes over his region on both legitimate and illegitimate businesses  These taxes assisted in funding his group's efforts to combat Communist guerrilla entities that were seeking to overthrow the Colombian government  It therefore is critical to consider what the defendant intended, and what he did not intend  As the government's witness, Nodier Giraldo, stated during his testimony, it was Mr Tovar Pupo's objective to *eliminate* the growing of coca in his region, and mounted a public effort to do so  His collection of taxes was intended to finance his organization's efforts to combat Communist guerrillas seeking to overthrow his country's government,

1

not to enrich himself This, we suggest to the Court, is a critical factor in evaluating what sentence our client should receive in this case

## Standard

The Court must consider the Federal Sentencing Guidelines, but under *United States v Booker* the Guidelines are "merely one sentencing factor among many, and the calculated guideline range must be considered in conjunction with the other § 3553(a) factors " *United States v Reinhart*, 442 F 3d 857, 864 (5th Cir 2006) (citing *United States v Booker*, 543 U S 220 (2005))

28 U S C § 3553 requires a "sentence sufficient, but not greater than necessary" when the following factors are considered "(1) the nature and circumstances of the offense and the history and characteristics of the defendant, (2) the need for the sentence imposed – (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense, (B) to afford adequate deterrence to criminal conduct, (C) to protect the public from further crimes of the defendant   (3) the kinds of sentences available   (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, and (7) the need to provide restitution to any victims of the offense "

## Tovar Pupo and the Colombian Armed Conflict

We dispute that Mr Tovar Pupo conspired to traffic narcotics with the *intent* that they be delivered to the United States Arguments in support of this challenge are reflected in the motion to withdraw the guilty plea, the evidentiary hearing regarding that motion, and our pending motion to dismiss We also have raised them in our objections

to the Presentence Report (the "PSR")[1] Those arguments are germane to sentencing, particularly given that this is not a heartland narcotics trafficking case and the underlying facts have not been litigated at trial

The environment and circumstances in which Mr Tovar Pupo lived have been addressed in the testimony of Nodier Giraldo, and by our client during his testimony in support of the motion to withdraw his guilty plea Starting in the mid-1960s, communist guerrillas, known as the Revolutionary Armed Forces of Colombia (the "FARC"), sought to undermine the Colombian government In response, the United States, in tandem with the Colombian government, helped to establish a paramilitary groups to combat the FARC This gave rise to a decades-long armed conflict FARC was on one side The Peasant Self-Defense Forces of Córdoba and Urabá (the "ACCU") and the Colombian government were on the other

The Colombian government effectively ceded control of certain territories to groups like the ACCU Mr Tovar Pupo and Mr Giraldo have testified to this effect The proposition is uncontestable Paramilitary groups like the ACCU carried out their actions with the protection and collaboration of the Colombian government[2]

It also is true that the production of narcotics was, at this time, endemic to Colombia The cultivation of illicit crops and production of narcotics in Colombia existed long before Mr Tovar Pupo's tenure as an ACCU leader Resolving this problem

---

[1] Our objections to the PSR are attached as Exhibit A

[2] Mario A Murillo & Jesús Rey Avirama, COLOMBIA AND THE UNITED STATES WAR, UNREST, AND DESTABILIZATION 91-92 (2004), *see also* Human Rights Watch, COLOMBIA HUMAN RIGHTS CERTIFICATION IV 9 (2002), *available at* http //www hrw org/legacy/ backgrounder/americas/colombia-certification4 pdf ("[P]aramilitaries continue to operate with the acquiescence and support of the Colombian armed forces and have consolidated and in some areas expanded control ")

3

required more resources and effort than Mr. Tovar Pupo had available.[3] Hence, Mr. Tovar Pupo sought help to eliminate cocaine and illegal crops from his region.

Mr. Tovar Pupo sought assistance from the United States to help combat the problem of narcotics in his region. He stated this during the evidentiary hearing on his motion to withdraw his guilty plea.

> Q. What efforts in 2002 or around that time did you make to eliminate narcotics traffickers from your region?
>
> A. Well, the first thing I did on an entirely personal basis, that is, I made this decision as an individual person not as part of an order given to me by the forces of which I was a part was to ask help from the United States government to assist in ending a problem that was in existence in that zone, in that region of Colombia.

Mar. 19, 2014, Tr. 76.

Mr. Giraldo, whose testimony was sponsored by the government, supported Mr. Tovar Pupo's testimony to this effect, testifying that Mr. Tovar Pupo led an eradication operation to be conducted in tandem with the Colombian government. Mr. Giraldo confirmed that Mr. Tovar Pupo was a signatory to a document calling for the eradication of illegal crops in Colombia, and that he signed the communiqué to this effect that was distributed both nationally and internationally. *See* Exhibit B. Mr. Giraldo further testified that the eradication of these crops began in 2003 with the support of both Mr. Tovar Pupo and Mr. Hernan Giraldo. He also testified that Mr. Tovar Pupo went on Colombian television and asked for help to eliminate narcotics from Colombia.

---

[3] In 1997, Colombia became the world's main supplier of coca leaves, the raw ingredient for cocaine. In 2000, it was estimated that Colombia grew 74% of the world's coca leaves. *See* "Why is less cocaine coming from Colombia?" THE ECONOMIST (April 2, 2013), *available at http://www.economist.com/blogs/economist-explains/2013/04/economist-explains-why-colombia-produces-less-cocaine*

4

The fact that Mr. Tovar Pupo taxed narcotics traffickers in his region is not inconsistent with his desire to remediate the presence of narcotics in his region. Rather, it is a reflection of the complexity of the situation he faced, his organization's need for funds to fight the communist guerrilla forces, and the balancing of a host of factors: the military considerations of the armed conflict, the limited resources of his region, and the challenges attendant to seeking to govern in a time of distress, among others. These circumstances bear directly upon the considerations of culpability and recidivism.

We further respectfully dispute the individual enhancements recommended in the presentence report for leadership and possession of a firearm. For the reasons provided below, these enhancements are inapposite to the facts and circumstances of this case.

### *Leadership Enhancement*

The recommendation in the presentence report in favor of a four-level enhancement for leadership under Section 3B1.1(a) of the Sentencing Guidelines should not be adopted by the Court. The commentary to Section 3B1.1(a) states as follows:

> This section provides a range of adjustments to increase the offense level based upon the size of a criminal organization (i.e., the number of participants in the offense) and the degree to which the defendant was responsible for committing the offense. This adjustment is included primarily because of concerns about relative responsibility. However, it is also likely that persons who exercise a supervisory or managerial role in the commission of an offense tend to profit more from it and present a greater danger to the public and/or are more likely to recidivate. The Commission's intent is that this adjustment should increase with both the size of the organization and the degree of the defendant's responsibility.

While Mr. Tovar Pupo unquestionably was a leader of the ACCU, the issue here is whether Mr. Tovar Pupo was a leader of a conspiracy to transport narcotics to the United States. In this regard, it bears emphasis though that Mr. Tovar Pupo concededly assessed

5

taxes on both legal and illegal activity. He testified to this point when describing the "war tax"

> The war tax was created in order to pay the costs of establishing and maintaining our de facto state. We worked as a de facto state since we were in fact replacing the social rule of law because they were not complying with their obligations. And specifically the war tax was used, were the resources for us to be able to pay for all we needed.

3-19-14, Tr. 77. Nodier Giraldo also confirmed that Mr. Tovar Pupo assessed taxes on all types of businesses, including ranches, farms, resorts, and hotels. This does not render him a manager or supervisor in the *conspiratorial activity* for which he is to be sentenced.

Mr. Giraldo's testimony also revealed details that corroborate how far removed Mr. Tovar Pupo was from the taxation of narcotics traffickers. Mr. Giraldo testified that he never introduced Mr. Tovar Pupo to the tax collectors, and that the tax collectors would deal directly with Mr. Giraldo. Mr. Tovar Pupo's testimony is consistent with this proposition.

> Q. What was your personal involvement in collecting taxes?
>
> A. Well I had no direct personal involvement in collecting these taxes. However, I was aware and informed of the order that I received to structure the collections of these taxes on all fronts on both legal and illegal economic activities. And therefore, to implement the order of all of the different fronts in the collection of this tax.

Mar. 19, 2014, Tr. 74. Neither these facts, nor those to which our client admitted during his Rule 11 proceeding, support imposition of this enhancement.

### *Firearm Enhancement*

The presentence report also recommends imposing an enhancement with regard to the use of firearms. For Mr. Tovar Pupo, carrying a firearm was not in pursuit of trafficking narcotics – it was a function of his role as a military leader in a prolonged

6

armed conflict. A firearms enhancement does not apply unless the use of the weapon is directly connected with the offense. Commentary to section 2D1.1(b)(1) of the Sentencing Guidelines states

> The enhancement for weapon possession in subsection (b)(1) reflects the increased danger of violence when drug traffickers possess weapons. **The enhancement should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense.** For example, the enhancement would not be applied if the defendant, arrested at the defendant's residence, had an unloaded hunting rifle in the closet.

USSG § 2D1.1(b)(1), cmt. 3(A) (emphasis added)

Mr. Tovar Pupo nearly always carried a firearm with him, but there is nothing in the record showing that he did so as part of a narcotics trafficking conspiracy or was related in any way to his role in the collection of taxes. The testimony of Mr. Tovar Pupo's and Mr. Giraldo demonstrates that Mr. Tovar Pupo's relationship with narcotics traffickers was the same as that for legitimate businesses: he made extremely general decisions about the amount of taxes to be assessed. These decisions, moreover, do not appear to have been made at any of the physical sites where cocaine was being produced or shipped. Further, Mr. Tovar Pupo disputes -- and has not admitted -- that he provided private security services for any narcotics traffickers. Instead, as stated in the motion to dismiss and as stated above, the security provided was, to Mr. Tovar Pupo's knowledge, part of the general provision of security over his region.

### *Cooperation*

While it is plain that the government will not be filing a motion seeking a downward departure based on cooperation in this case, Mr. Tovar Pupo did submit to two extended interviews with the government following entry of his plea of guilty. We understand that he also provided substantial assistance and information that ultimately

helped the government obtain a guilty plea from Carlos Mario Jimenez, "Macaco," and very possibly others. Further, it should be noted that Mr. Tovar Pupo voluntarily surrendered to the Colombian government as part of the demobilization in 2006.

The government is prohibited from seeking a life sentence. This was an assurance that was made by our government to all defendants extradited from Colombia to the United States. *See* Tovar Pupo Plea Agreement at 1 n.1, Crim. No. 04-114-09 (RBW) (July 22, 2009). Mr. Tovar Pupo is 54 years old. Given his age, the Guidelines range of 360 months to life would constitute a life sentence. The Court is not required to impose such a sentence, and should not do so.

Our client has been incarcerated in the United States since his extradition in May 2008. He was first incarcerated in or around mid-2006 when he surrendered to the Colombian government in accord with the demobilization.[4] He has been in jail for nearly a decade. He still has family back home, including his parents and his three children.[5] He very much hopes to see his family again, but even when he is able to return to Colombia, he will have to submit to the Colombian justice system. We request that the Court factor into consideration any time Mr. Tovar Pupo might serve in Colombia when he returns.

We respectfully request that the Court take these factors into consideration when sentencing our client.

---

[4] Under the plea agreement, the government agreed that Mr. Tovar Pupo should receive credit for time served in Colombia while awaiting extradition, starting from August 16, 2006. *See* Plea Agreement ¶ 34.

[5] We have attached letters from Mr. Tovar Pupo's family members and friends as Exhibit C.

8

Date: April 6, 2015                          Respectfully submitted,


                                                              /s/ *Lloyd Liu*
Lloyd Liu
DC Bar No. 1007075
lloyd@coburngreenbaum.com
Tel: 202-470-1689
Barry Coburn
DC Bar No. 358020
barry@coburngreenbaum.com
Tel: 202-657-4490
COBURN & GREENBAUM, PLLC
1710 Rhode Island Ave
Second Floor
Washington, DC 200036
Fax No: 866-561-9712

*Counsel for Defendant Rodrigo Tovar Pupo*

9

CERTIFICATE OF SERVICE

      I hereby certify that on this 6th day of April 2015, I caused to be delivered a true and accurate copy of the foregoing via electronic mail and regular mail to

      Paul Laymon
      U.S. Department of Justice, NDDS
      1400 New York Avenue, N.W.
      Eleventh Floor
      Washington, DC 20530


                                  /s/ *Lloyd Liu*
                                Lloyd Liu