```
1                    IN THE UNITED STATES DISTRICT COURT
                        FOR THE DISTRICT OF COLUMBIA
2
      - - - - - - - - - - - - - - - x
3     THE UNITED STATES OF AMERICA,
                                             Criminal Action
4                 Plaintiff,                 No:  1:04-cr-00114-RBW
                                             Date:  May 8, 2015
5     vs.                                    Time:  9:11 a.m.

6     HERNAN GIRALDO SERNA, et al.,

7                 Defendant(s).
      - - - - - - - - - - - - - - - x
8     _____

9                     TRANSCRIPT OF STATUS CONFERENCE
            HELD BEFORE THE HONORABLE REGGIE B. WALTON
10                     UNITED STATES DISTRICT JUDGE

11    _____

12    APPEARANCES:

      For the United States:    PAUL WARREN LAYMON, JR., ESQ.
13                              U.S. DEPARTMENT OF JUSTICE
                                Narcotics and Dangerous Drug Section
14                              145 N Street, NE
                                Second Floor, East Wing
15                              Washington, DC 20530
                                (202) 514-1286
16                              paul.laymon@usdoj.gov

17    For the Defendant:        ROBERT A. FEITEL, ESQ.
                                LAW OFFICE OF ROBERT FEITEL
18                              1712 N Street, NW
                                Washington, DC 20036
19                              (202) 450-6133
                                RF@RFeitelLaw.com
20
      For the Movants:          LEO P. CUNNINGHAM, ESQ.
21                              WILSON SONSINI GOODRICH & ROSATI, PC
                                650 Page Mill Road
22                              Palo Alto, CA 94304
                                (650) 493-9300
23
      (CONTINUED ON NEXT PAGE)
24
      Proceedings recorded by mechanical stenography; transcript
25    produced by computer-aided transcription
```

```
1       APPEARANCES (CONTNIUED):

2    For the Movants:          MELISSA B. MANNINO, ESQ.
                               WILSON SONSINI GOODRICH & ROSATI, PC
3                              1700 K Street, NW
                               5th Floor
4                              Washington, DC 20006
                               (202) 973-8856
5                              mmannino@wsgr.com

6                              ROXANNA M. ALTHOLZ, ESQ.
                               INTERNATIONAL HUMAN RIGHTS CLINIC,
7                              BERKELEY SCHOOL OF LAW
                               489 Simon Hall
8                              Berkeley, CA 94720
                               (510) 643-8781

9

10

11

12

13   Court Reporter:          Lisa A. Moreira, RDR, CRR
                               Official Court Reporter
14                             U.S. Courthouse, Room 6718
                               333 Constitution Avenue, NW
15                             Washington, DC  20001
                               202-354-3187
16

17

18

19

20

21

22

23

24

25
```

1                    P R O C E E D I N G S

2          THE COURT:  Good morning.

3          THE COURTROOM DEPUTY:  Good morning, Your Honor.

4          MR. LAYMON:  Good morning, Your Honor.

5          THE COURTROOM DEPUTY:  Criminal Action No. 04-114,

6   *United States of America vs. Hernan Giraldo Serna*, whose

7   presence is waived for this hearing.  Paul Laymon on behalf

8   of the Government; Robert Feitel on behalf Mr. Serna; Leo

9   Cunningham and Roxanna Altholz on behalf of the movants.

10         THE COURT:  Has the review that the parties were

11  going to conduct taken place?

12         MR. LAYMON:  Yes, Your Honor.  Mr. Feitel and I,

13  with the Court's assistance, were able to review the sealed

14  filing in the case.  That sealed filing consists of both a

15  paper file and an electronic file, and we were able to meet

16  with the clerk and review that file.  We were able to review

17  all of the documents and all of the electronic entries in

18  the file, Your Honor.

19         There was -- from the Government's perspective,

20  there was one document, it was a letter related to grand

21  jury 6E material, that named several DEA agents.  We would

22  probably -- we would move to redact a portion of that

23  letter.  That was the only document really that the

24  Government felt should remain sealed, partly sealed.

25         Without wishing to speak for Mr. Feitel, I'll

1    speak to the plea agreement and the statement of facts.

2    Curiously, the plea agreement and the statement of facts in

3    the case are not contained in the clerk's file, neither in

4    the paper file nor in the electronic file is there an entry

5    for the plea agreement or the statement of facts.  There's

6    no -- for example, no number was assigned to either

7    document.  There's no minute entry which indicates that

8    there was a plea and the plea and the statement of facts

9    were accepted, which is curious, but not present in the file

10   for some reason.

11        However, the parties do obviously possess a copy

12   of the plea agreement and the statement of facts, as I'm

13   sure the Court does, too.  Mr. Feitel, I think, would tell

14   the Court that he would prefer those documents remain under

15   seal but that perhaps they could be released to the movants

16   with some kind of protective order, but I'll let him deal

17   with that.

18        But other than those documents, Your Honor,

19   that portion of the 6E letter that I've described and

20   then the plea agreement and the statement of facts, I think

21   Mr. Feitel and I had agreed that every other filing -- every

22   other document in the file could be unsealed.

23        THE COURT:  So what's your position on the plea

24   agreement and the statement of facts?

25        MR. LAYMON:  I'm comfortable with Mr. Feitel's

1    position, Your Honor, that they could remain under seal but

2    released to the movants with the proper protective order.  I

3    don't have any objection to that, if that's the way the

4    Court wants to go with it.

5            THE COURT:  Well, as I understand, there's also a

6    motion that's been filed by the media also requesting

7    unsealing, so a protective order, as it relates to the

8    movants, doesn't really resolve that issue.

9            MR. LAYMON:  Let me -- if I might, Your Honor,

10   I'll let Mr. Feitel address that because I think he might

11   want to speak to that.

12           THE COURT:  Okay.  Mattie, do you have any idea

13   why this information would not be contained in the --

14           THE COURTROOM DEPUTY:  The only thing is back

15   then, because it's an '04 case, it's possibly been treated

16   as a partially sealed document.  It could be in the vault

17   maybe or maybe in our vault program, which we have a hard

18   time getting into now, but we can still get in there and see

19   perhaps if it's in there.

20           THE COURT:  Okay.  The clerk's saying that it

21   probably exists somewhere but, since it's such an old case

22   and we were using a different system then, that they just

23   haven't been able to put their hands on it, but she believes

24   it probably would be somewhere down in the clerk's office.

25   I would suspect that would be the case since it was a

1   document that was made a part of the record, so I assume

2   it's somewhere.

3            MR. FEITEL:  Good morning, Your Honor.  I'll try

4   to make this -- the easy part first.  On behalf of the

5   Defendant Hernan Giraldo Serna, we have no objection to the

6   unsealing of the docket, at least as I understand it to

7   exist, and that includes -- you may remember that the

8   defendants were -- the punitive intervenors were asking for

9   access to the original indictment in this case and to other

10  documents.  Those are on the court file.  We have no

11  objection to unsealing the original indictment, the

12  superseding indictment, and all of the other motions, orders

13  to seal, and orders to unseal that are in the docket.

14           With respect to the more, I guess, complicated

15  issue of the plea agreement and the facts, it was not in the

16  physical documents we reviewed.  Moreover, there's not an

17  electronic docket entry reflecting the date of the

18  acceptance of the plea.  There's a discussion in the docket

19  entry that says a presentence report would be ordered, but

20  there -- and a plea date was set, a sentencing date was set,

21  but the documents themselves were not on the public docket.

22           Mr. Laymon and I were both somewhat surprised, but

23  neither of us participated in the hearing itself so we have

24  nothing really to add.  I called Ms. Amato, predecessor

25  counsel, and asked if she knew anything about it.  She had

1    nothing, you know, useful -- all she could do was speculate,

2    the same as everyone else.

3            With respect to where we stand now, as to the

4    motion -- as to the movants, I have -- I believe that as a

5    matter of fairness they ought to have access to the plea

6    agreement and the facts.  I think they want to press their

7    legal rights, and they need to have full information to do

8    so.

9            But that proceeding is sort of ancillary to the

10   actual criminal case, and at this point I think it's prudent

11   to keep my client's plea agreement and factual statements

12   under seal to the extent that they -- except to the extent

13   that counsel needs to use it in filing any pleadings with

14   the Court.  I don't want it to be a license to include all

15   of the contents of the plea agreement and the facts, but I

16   think that they have a right to have it.  I just don't want

17   it to become a publicly disseminated document.

18           And so there are plenty of cases in which the

19   Government submits -- provides the discovery, and the

20   defendants are held to sealing orders, and I think this is

21   an appropriate exercise of that discretion.  My client

22   hasn't been sentenced.  He's still in cooperation with the

23   United States, and I think that the terms of his plea

24   agreement, particularly the terms of the plea itself, are

25   not particularly relevant to the issue as to whether or not

1    the Hernriquez family are victims as defined by the Victims'

2    Rights Act.  I think it's more relevant what the factual

3    statement has to say about that.

4            So I would ask Your Honor -- I'm perfectly fine to

5    turn it over, although I should say that I reviewed my

6    docket again, and I don't actually have a signed copy of the

7    plea agreement or statement of facts.  I hadn't noticed that

8    earlier.  I received the file from Ms. Amato, and I don't

9    know if Mr. Laymon does, but I want to say one last thing.

10   As to the Freedom -- to the Reporters Committee motion to

11   unseal the docket, until we determine whether or not the

12   documents exist in the court files, it's a moot point.

13           I have no objection to the case being unsealed for

14   the Reporters Committee to the extent that it already

15   exists.  If it's not on the court docket, that's another --

16   I think it's an interesting legal question as to whether or

17   not it should be or a practical problem whether it should be

18   and what should be done, but if it's not on the docket, Your

19   Honor can't -- there's nothing to be ordered to be unsealed.

20   I think the issue is moot as to any documents that are not

21   part of the official court record.

22           There might be -- to be fair, I mean, practical

23   people could find a way to remedy that.

24           THE COURT:  I suggest that it's somewhere.

25           MR. FEITEL:  Yes, and if it is, then I'll have --

1    I'll try to have a principal response to the Reporters

2    Committee.

3            But at this point in time, I think the movants

4    ought to have these documents in fairness, but I think it

5    ought to be under a protective order.  I know that they're

6    clamoring to have it released publicly, but that's

7    unnecessary for them to press their case, and the larger

8    issue about what the public should or shouldn't do I don't

9    think is -- should be resolved in this what I consider to be

10   tangential proceeding at this point.

11           They haven't -- they don't have status yet.  Until

12   Your Honor grants them status to participate in the case,

13   the movants are not participants in the direct criminal

14   case.

15           THE COURT:  Any response?

16           Well, I mean, I will -- based upon the concession

17   regarding what currently exists on the record, I will order

18   that that be made available to the movants.  In reference to

19   the plea agreement and the statement of facts, I'll instruct

20   the court clerk to check with her office to see if those

21   documents can be located because I assume they're somewhere

22   in the court clerk's office.  And if they are not, they

23   should be, because they should be a part of the record, even

24   if it's under seal.

25           MR. CUNNINGHAM:  Your Honor, Mr. Feitel is

1    unfairly shifting the burden here with respect to the

2    unsealing of the plea agreement and the plea facts.  He may

3    well prefer that the world not know what his client pled

4    guilty to, but that -- his preference really doesn't come

5    close to what the standard is.  The D.C. Circuit has

6    addressed this, made clear that there is a First Amendment

7    right with respect to access to plea agreements and plea

8    proceedings, and in order to overcome the presumption in

9    favor of access, there has to be a compelling interest to

10   protect by denying access, and there has to be no reasonable

11   alternative.

12            And in this case, I mean --

13            THE COURT:  Well, do you need it?  I mean, for

14   your purposes, do you need it beyond having it available to

15   you with a protective order?

16            MR. CUNNINGHAM:  I believe I do.

17            THE COURT:  Why is that?

18            MR. CUNNINGHAM:  Because, as Your Honor will

19   recall from our last discussion, there seem to be ships

20   passing in the night as to what the crime was here.  I

21   thought it was a cocaine importation conspiracy, but what I

22   heard described by Your Honor was really it's conduct

23   relating to taxing drug dealers.

24            For me to establish the connection between the

25   harm to my clients' family member and this crime, I need to

1    be able to explore what the crime, in quotes, really was,

2    and that's going to be elaborated on by what --

3          THE COURT:  Isn't that dictated by what the

4    Government charged Mr. Feitel's client with?

5          MR. CUNNINGHAM:  Not so clear, because the

6    Government -- what the Government charged his client with is

7    a very broad conspiracy, and I would be delighted if Your

8    Honor said, "Yes, that's all that matters, and since that

9    conspiracy alleged the manufacture of cocaine, and since my

10    guy was trying to stand in the way of the manufacture,

11    that's enough of a connection," and we win.  But that

12    doesn't seem to be where we are in these proceedings because

13    they've said, "Well, now let's look at what the plea was

14    to."

15          I've never seen the plea.  I don't know what those

16    facts are, and it sounds to me like what went on here --

17          THE COURT:  Well, the plea, in many situations,

18    which may be the case here, is often narrower than the

19    indictment itself, and it seems to me that the indictment

20    itself sets the parameters of what the federal offense is as

21    charged by the Government.

22          I mean, I'm not -- I assume you're not suggesting

23    if the Government decides to narrow the scope of what they

24    believe they can prove, and that's set forth in the

25    indictment, that you could then insist that I somehow

1    conduct a hearing to expand the scope of what the conduct

2    was even though the Government made a decision not to charge

3    that by way of the indictment.

4          MR. CUNNINGHAM:  But in this case, Your Honor,

5    they did charge a broad conspiracy by way of an indictment.

6    Where the narrowing seems to have occurred is in connection

7    with the taking of the plea.

8          THE COURT:  That's not my understanding.  My

9    understanding is that the plea was, in fact, consistent with

10   what they charged in reference to Mr. Feitel's client, that

11   he was involved in a tax collection of money from people who

12   he knew or had reason to know were involved in the

13   importation of drugs into the United States.

14         MR. CUNNINGHAM:  Your Honor, the indictment makes

15   no mention of anything like tax collection.  The indictment

16   talks about the manufacture, distribution, and importation

17   of cocaine, and that is directly related to and is the cause

18   of the death of my clients' family member.  So somewhere

19   between the indictment and the plea things got changed or

20   narrowed, and that's why I want to know what those facts

21   are.

22         And to come back to Your Honor's original

23   question, do I need it, do I need the actual plea agreement

24   and to be able to talk about it to other people?  Yes, I

25   think I do because if, in fact, there's been a narrowing --

1          THE COURT:  But don't you only need to do that

2     once you're granted victim status?

3          MR. CUNNINGHAM:  No, I need it in order to

4     establish victim status based on the arguments that both the

5     Government and the defendant have made because, in essence,

6     they're saying since all he was was a tax collector, and tax

7     collection didn't cause the death of your guy, the

8     manufacturer of cocaine did, you're not a victim.

9          And I say, but wait a second, the alleged offense

10    is that he was -- the defendant was manufacturing cocaine,

11    and that's directly related to my clients' family member's

12    death.

13         So there's this huge disconnect between the tax

14    collection and the manufacture of cocaine, and I should be

15    allowed to explore and resolve that.  And I've been excluded

16    -- the whole world has been excluded from the plea process,

17    and if I am a victim, then I should have been able to confer

18    with the Government before they entered into the plea

19    negotiations and agreed to whatever they agreed to, which

20    appears to be a narrowing of facts.

21         And I am not relying solely on the broad language

22    in the indictment.  We have -- and we've submitted as an

23    exhibit a DEA report, redacted, but a DEA report that

24    describes Mr. Feitel's client's conduct, and it says that he

25    was -- he and his associates were responsible for the

1    importation of over 50 tons of cocaine into this country.

2            The DEA report isn't limited to talking about

3    taxes.  This guy was producing cocaine and dumping it in

4    America, and it was the production of cocaine that led to

5    the death of our client.

6            So this -- I should be able to resolve this

7    disconnect.  There's enough of a basis, both in the form of

8    the indictment and in available Government records, to know

9    that this guy was not merely a tax collector in Columbia.

10   But, again, here I am.  I haven't seen the plea agreement.

11   I haven't seen the plea agreements of the co-conspirators,

12   which are also under seal, and which I would ask be

13   unsealed.

14           There are just -- there's a disconnect here that's

15   very troubling, and it's hard to resolve given the amount of

16   secrecy.  But I want the plea agreement.  I want the factual

17   basis.

18           Is it fair to put me under a nondisclosure

19   obligation?  I submit that it's not because the factual

20   basis never should have been sealed in the first place, as

21   far as I can tell, and based on the showing -- if the

22   showing that was made earlier is the showing that was made

23   today, it's not even close.  It's not even close.  I haven't

24   heard articulated a compelling interest for protecting the

25   factual basis for the plea.

1          The factual basis --

2          THE COURT:  Well, there was, at the time that the

3    proceedings were placed under seal, in my view, a sufficient

4    predicate for sealing the proceedings.  You may not care,

5    but I'm sure someone who may be a cooperator with the

6    Government cares about whether that information becomes

7    known because people who cooperate with the Government get

8    killed.

9          MR. CUNNINGHAM:  I appreciate that.  I was a

10   prosecutor for eight years.  I did cases somewhat like this.

11   I had cooperators, and here's how I used to do it.

12          I used to have a plea agreement.  It had a factual

13   basis.  I had an addendum to the plea agreement.  The

14   addendum to the plea agreement laid out the likely result of

15   the cooperation and the rules of the cooperation.

16          We kept the addendum to the plea agreement under

17   seal, but the factual basis for the plea, that didn't have

18   to be under seal.  That didn't reveal the fact of

19   cooperation.  That was holding this man responsible --

20   whichever man it was -- responsible for his criminal

21   conduct, which the world has a right to know.

22          So if there is a compelling interest -- and it

23   hasn't been articulated this morning by Mr. Feitel or the

24   Government -- then Your Honor has to assess whether or not

25   there are narrower ways to protect that interest than

1    keeping everything about the plea under seal.

2          THE COURT:  Well, I don't know how long ago you

3    were a prosecutor, because I was, too, and the world has

4    changed significantly since I was a prosecutor, and I'm sure

5    probably since you were a prosecutor, and it has become a

6    lot more complex in today's world in reference to

7    cooperators as compared to what it was in the past.

8          Because I know -- for example, I have a nephew who

9    unfortunately got in trouble and is now serving time.  And

10   when he went to the institution, the first thing that the

11   inmates asked was they wanted his -- they wanted his plea

12   agreement because they wanted to find out if he was a

13   cooperator.  Even though he may not have been a cooperator

14   against them, they just don't like what they call snitches.

15   So they wanted that plea agreement, and if he didn't provide

16   it, he was told he was going to be at risk as far as his

17   life was concerned.

18         And you've got this operation called -- you know,

19   I forget what it's called, but it's on the --

20         MR. CUNNINGHAM:  Who's The Snitch out of

21   Philadelphia?

22         THE COURT:  Yes.  I mean, so the world has changed

23   significantly, and sometimes if you just have certain

24   aspects of a case on the docket, and you don't have the

25   entire matter sealed, that sends a signal.

1    So like I say, the world has changed significantly

2    since I was prosecuting cases, and that's why sometimes the

3    entire case is, in fact, placed under seal; because to do

4    otherwise is sending a signal that this person is a

5    cooperator, and therefore them and their family are put at

6    risk.

7          MR. CUNNINGHAM:  Well, I appreciate that there are

8    risks to cooperators.  I think that one can reasonably

9    disagree about the best way to protect people who are

10   cooperating.  I would respectfully submit that when you put

11   an entire docket under seal, and it remains under seal for

12   over seven years, anyone who has any experience with respect

13   to dope cases is likely to infer that's because of

14   cooperation because there aren't many other plausible

15   reasons, which is why the elegant solution here would be to

16   not seal everything but only seal those things that

17   establish that there's cooperation going on.

18         And the factual basis for the plea doesn't do

19   that.  A cooperation in the plea agreement may well do that.

20   That should be redacted, or frankly it shouldn't have been

21   in there in the first place.  It should have been in a

22   separate agreement like I used to do it.

23         THE COURT:  Well, contrary to what you're saying,

24   in most situations where there is a cooperation agreement

25   the case doesn't go to sentencing within the time frame that

1    the case normally goes to sentencing and, therefore, that

2    sends a signal.  So if they're not setting the case within

3    70, 80 days after the plea was entered, somebody astute

4    enough, they'll know that this person probably is a

5    cooperator because if the case is pending sentencing four,

6    five, six months, it's known.

7             MR. CUNNINGHAM:  It's true.

8             THE COURT:  So maybe there's no way you can

9    conceal it.

10            MR. CUNNINGHAM:  There may be no way.  In fact, I

11   think if we were to look at the numbers, if it's a dope

12   case, there's likely to be cooperation.  That's sort of the

13   result of the way the mandatory minimums work.  So it's

14   hardly a surprise.

15            But where we are, Your Honor, is I submit there

16   has not been made this morning the showing that's required

17   in order to keep the plea agreement and the factual basis

18   under seal.  And it isn't fair to put me under risk of

19   contempt in order to get that, in order to get the factual

20   basis.

21            And quite frankly --

22            THE COURT:  I guess I don't understand why you

23   need to make it public before you're given victim status.

24            MR. CUNNINGHAM:  Well, so I don't intend to just

25   go public with it, but I would like to be able to ask people

1    about it.  I would like to be able to share it with my

2    client.

3             THE COURT:  But can't you ask people about what

4    occurred just knowing what you know right now?  I assume you

5    have the capacity of asking family members or anybody else

6    who would know about this incident -- situation what

7    purportedly the defendant did.

8             MR. CUNNINGHAM:  I could, but I would also like to

9    -- well, it's a matter of detail.  The devil's in the

10   details.  I would like to know if there's a factual basis --

11   "Can you, Knowledgeable Person in Colombia, tell me what the

12   amount of truth is in this?"  If they've got -- if the

13   Government has somehow misunderstood something, let's look

14   at the details.  Is there a reason?  Was this someone else

15   doing this?  What precisely was --

16            THE COURT:  Assuming, you know, you find

17   individuals who would say something contrary to what the

18   Government alleges is the predicate for either the

19   indictment or the plea, then what's the remedy?  Does the

20   Court then have to conduct some type of a hearing to

21   supplement the record to assess independently what the

22   federal crime is as compared to what the Government said it

23   was?

24            MR. CUNNINGHAM:  I think you may have to.

25            THE COURT:  I don't know about all that.  I mean,

1     I think, you know, the Court has a limited role, and I don't

2     think the Court becomes a prosecutor and starts to set the

3     parameters of what a federal crime is beyond what the

4     Government alleges that crime is.

5               MR. CUNNINGHAM:  So I recognize that the statute

6     has limits, and the victims don't get to make the ultimate

7     calls about how a case gets prosecuted, just like Your Honor

8     doesn't.  It's an executive function.  I understand that.

9               But the statute gives victims certain rights.

10    Notably, in this area, it's the right to confer, and, you

11    know, that's really -- with respect to the plea agreement,

12    that's what we care about.  We would have liked to have been

13    able to confer with the Government before this plea

14    agreement was entered.

15              THE COURT:  Okay.  Mr. Feitel, I guess I do have

16    some question about what -- considering where we are in this

17    case, I mean, I don't necessarily agree with some of the

18    positions that are being taken about why we don't have to

19    seal records, but in this situation, the cat is out of the

20    hat, so I just don't know at this point what is further

21    accomplished by maintaining the secrecy of either the plea

22    agreement or the factual predicate for it.

23              MR. FEITEL:  If I might, Your Honor, briefly?

24    First, just as an overarching matter, Your Honor knows that

25    the Government crafts its indictments in the broadest

1    possible way.

2         THE COURT:  Right.

3         MR. FEITEL:  That's been the rule since I can

4    remember, and I was a prosecutor beginning in 1987.  People

5    do it broadly because the prosecutors believe it gives them

6    a tactical advantage in terms of admitting evidence and the

7    like.

8         When the case is resolved by a plea agreement,

9    there's an agreement among the parties in which a defendant

10   admits to a factual predicate.  It doesn't necessarily

11   involve every aspect or every allegation of necessity that's

12   charged in the indictment.  You can uncharge an indictment

13   to distribute and produce cocaine, and a person's role in

14   the offense, if they were a transporter or they were a mule,

15   is going to be much more limited in the overarching scope of

16   the conspiracy.

17        So there's nothing untoward and I don't think

18   there's anything unusual about the fact -- about the way

19   this case proceeded to more limited facts.  If the movants

20   were unaware of what the theory of the prosecution was, I'm

21   sorry, but now they've been illuminated.  So we have two

22   questions.

23        This case was placed under seal at this Court's

24   order, I believe at the behest of prior counsel for my

25   client, and the Government, for the reasons that I will -- I

1    believe the reasons were to protect my client's safety and

2    security.  This is a case in which my client is a Colombian

3    national, and I will tell Your Honor that in my experience

4    it is not -- it is without doubt the most dangerous thing in

5    the world to come here and cooperate.  I have personally had

6    three clients who have been murdered upon their return, and

7    there are others in the press all the time.  They killed a

8    woman named Lorena Henao to, I believe, hold my -- one of my

9    clients accountable for his cooperation.

10           I mean, Colombia, for all the progress it's made

11    in terms of establishing the rule of law, still remains a

12    violent place where criminal gangs control large swaths of

13    the country, and the nature of political corruption is

14    pretty rampant.

15           So the movants say they want to know the facts,

16    and they want the plea agreement, and that they want to make

17    those documents public.

18           With respect to the plea agreement itself, I can

19    see of no -- I continue to insist that the terms of my

20    client's cooperation and the proviso in that agreement put

21    his life at risk if they were made public here or anywhere

22    else.  Particularly in Colombia.  I don't want them

23    published in *El Tiempo* or *El Espectador* or some other

24    Colombian newspaper tomorrow morning for everyone to know

25    that he's in cooperation while his family still lives there.

1            With respect to the statement of facts, they

2      delineate with more detail how my client's block imposed

3      taxes against people who are producing and distributing

4      cocaine in that block for ultimate importation illegally

5      into the United States.  I don't see how anyone would need

6      to share any more than that particular quantum of

7      information to undertake an investigation in this case.

8            I do not agree that the movants have license --

9      they can go and talk to anyone they want.  And even if they

10     came back here and said this was completely wrong in their

11     opinion, I don't think that they get to overturn or upset

12     the plea agreement that's been entered by the parties and

13     accepted by the Court.

14           My underlying concern about this is that the test

15     for who is a victim is someone who is directly and

16     proximately injured by the offense that the defendant

17     committed.

18           We're talking about an international drug

19     trafficking offense as the predicate for what my client pled

20     to.  What the movant is saying is that a murder was

21     committed in furtherance of it, and the theory of the murder

22     is that Mr. Hernriquez opposed the cultivation of cocaine in

23     Colombia and that somehow the underlying conspiracy of

24     necessity -- even though it's charged nowhere, not exactly

25     in the indictment, not by the facts, not in the plea

1    agreement, not by anything that anyone has ever said about

2    my client, the movants are saying that indirectly there must

3    be assumed to be in that conspiracy another hidden object to

4    kill anyone who ever said anything that might arguably, in

5    some unforeseeable future, affect my -- affect the

6    imposition of taxes that my client was doing as part of this

7    drug conspiracy.

8          I think that on its face there is a huge factual

9    legal and logical disconnect between the charges against my

10   client and the facts and what the victims are saying, the

11   alleged victims are saying happened to Mr. Hernriquez.  I'm

12   sorry that he was murdered.  No one can say otherwise, that

13   it wasn't a tragedy, but there's a huge logical disconnect

14   between the facts and what happened.

15         These documents, as far as I know, aren't on the

16   public record.  I'm trying to be forthcoming.  I think that

17   the plea agreement should remain under seal.  I think that

18   the defendants -- the movants should have access to the

19   facts, and I think that they should be able to discuss with

20   people the subject matter, but I don't think the document

21   itself should be in the public domain at this point in time.

22   It does implicate my client's security interests.

23         I don't want anyone who is in Colombia -- you

24   know, even though my client's been here a while, and even

25   though time has passed, these conspiracies are ongoing for

1    many, many years.  I have cases in which the allegations of

2    conspiratorial conduct last for more than a decade or two.

3    So it's perfectly possible that people who were involved in

4    the distribution and the manufacture in Colombia are still

5    subject to potential prosecution by the United States,

6    particularly because the Department of Justice takes the

7    view that a conspiracy doesn't end until all the money is

8    laundered, which sometimes takes as long as the drug

9    trafficking conspiracy.  It is not fanciful to say that my

10   client's safety, the safety of his family and his other

11   associates is at risk.

12           And I think that the facts can be disclosed to the

13   movants.  They can understand what they are.  They can ask

14   anyone they want about this theory, but I don't think that

15   the document needs to be at this time in the public domain,

16   and I don't think that the movants are in an appropriate --

17   this is an appropriate vehicle to unseal the entirety of the

18   case against my client.  Particularly -- I mean, I've agreed

19   to everything except the statement of facts and the plea

20   agreement, which are the most, I think, precious documents

21   that are involved in this matter.

22           THE COURT:  Thank you.

23           MR. CUNNINGHAM:  Respectfully, Your Honor, again,

24   there's been no articulation for a compelling reason to keep

25   the facts under seal.

1          THE COURT:  How can you do that in a situation

2     like this?  I mean, he's represented, as an officer of the

3     court, that three of his prior clients have been killed in

4     Colombia when they returned to Colombia, and I assume he's

5     suggesting that these individuals were cooperators.  Is that

6     correct?

7          MR. FEITEL:  Yes, Your Honor.

8          THE COURT:  And here I've got the same situation.

9     I mean, so what do we have to have?  An actual statement

10    from somebody that he's going to be killed?

11         MR. CUNNINGHAM:  No.  No, no, no, no, no.

12         THE COURT:  So -- and, I mean, it's one thing, it

13    seems to me, if there is verbal information alleging that

14    certain conduct was engaged in by someone as compared to the

15    actual document itself, the court official document.  It

16    seems to me that that becomes something very different.

17         MR. CUNNINGHAM:  So there appear to be two

18    documents at issue.

19         THE COURT:  Right.

20         MR. CUNNINGHAM:  One of which would -- apparently

21    has a provision that would reveal the cooperation.  If it

22    does, I don't need that.  I don't need a paragraph that

23    says, "This defendant has committed to cooperate."  I really

24    don't need that.

25          I care about the other document, the factual

1   basis, and I haven't heard any explanation or justification

2   for keeping that under seal.

3          THE COURT:  Why would that need to be under seal,

4   Mr. Feitel?  Because I assume -- I mean, there's nothing, as

5   far as I can recall, that would be in that factual scenario

6   that would indicate cooperation by your client.  I mean, are

7   you suggesting that because he agreed to certain facts, that

8   that, in and of itself, places him in danger?

9          MR. FEITEL:  I have great misgivings about

10  unsealing the plea agreement.  I understand that on its face

11  the plea facts themselves do not implicate anyone else in

12  cooperation.

13         THE COURT:  I mean, if the plea -- if that part of

14  the plea agreement that indicates any type of cooperation is

15  redacted, is there a problem with the rest of it, and is

16  there a problem with the facts themselves, if the facts

17  don't say anything about cooperation, that being made

18  available?

19         MR. FEITEL:  As to the plea agreement itself, I

20  ask that it remain in totality under seal.  I don't think

21  it's possible to redact it out.  A lot of it is about his

22  obligation.  Almost all of it is about his obligation with

23  the United States Government.  It's a form plea agreement

24  that the Narcotics and Dangerous Drug Section insists on,

25  and almost all of it discusses cooperation and his

1    responsibilities.  I'll be glad to send a copy to chambers.

2    Your Honor can review it.

3            As to the facts, I continue to object, and I think

4    it's going to take a court order to get me to agree to turn

5    it over.

6            THE COURT:  But, I mean, I'm not asking you to

7    agree that it be turned over.

8            MR. FEITEL:  Right.

9            THE COURT:  I'm just asking, how would the mere

10   facts that form the predicate for the plea, if that became

11   public, how would that put your client at risk?

12           MR. FEITEL:  Because it's part of the milieu of

13   the plea agreement.  They are not severable in the way that

14   we discuss them here.  They are two separate pieces of

15   paper.  In lots of cases they're all put together, and I

16   think admitting to the facts as a public matter and becoming

17   a public document puts my client in a position that I think

18   is unfair to him.

19           I think it's -- I can't say directly that putting

20   him and the facts in the public domain are going to make his

21   life at risk or that of his family, but I think that if it's

22   in equipoise, the right decision is to keep it under seal,

23   to let the movants have access to the document, and to

24   resolve it later.  I don't see how them having the document

25   to themselves and not being in the public domain interferes

1    in even the remotest way to their rights to move to become

2    involved in this case as victims under the Victims of Crime

3    Act.

4              THE COURT:  I think you have to be a little more

5    exacting than what you have been.  I understand, you know,

6    your advocacy in support of your client, but I think you

7    have to be a little more exacting in reference to the danger

8    that your client will be placed in if the mere facts that he

9    acknowledged were unsealed.

10             MR. FEITEL:  Well, that's, of course, part of the

11   problem, because it requires me to divine what may or may

12   not happen and what other people may or may not do when

13   they're in possession of the facts, and what the -- I mean,

14   if I turn them over --

15             THE COURT:  If you want to do that ex parte, to

16   explain to me why you believe that the mere revelation of

17   the facts in written form would somehow place your client at

18   risk and you feel that revealing that publicly would

19   exacerbate that, obviously I'll hear you ex parte.

20             MR. FEITEL:  I'd like to make a suggestion, and

21   I'd like to think about it.  I have not -- I think it's best

22   to organize your thoughts in writing.  If I could have until

23   Wednesday of next week, I'll either submit an ex parte

24   pleading to Your Honor explaining why I think it should

25   remain under seal, or I'll notify the Court and counsel that

1   I have no objection to release of the factual part of the

2   plea agreement or the statement of facts.

3          THE COURT:  And the plea agreement itself --

4   again, I'll have to go back and look at it.  It's been a

5   long time since I've reviewed these plea agreements, and I

6   have to go back and look at it and see if what you say about

7   the fact of cooperation is permeating throughout the

8   agreement.

9          That's generally not the case with most of the

10  agreements I see, but maybe you're right in reference to

11  this one.  But I haven't looked at it for some time, so I'd

12  have to check it and see exactly what it says.

13         MR. FEITEL:  Well, I may have to provide a copy to

14  Your Honor since it's not in the --

15         THE COURT:  I probably have it in my file, I

16  assume.  If I don't, we'll let you know, but I assume I have

17  it somewhere in here.

18         But as I said, it seems to me that most

19  agreements -- maybe this one is different -- with certain

20  redactions can be made available without revealing the fact

21  that cooperation was a part of the agreement.  But I'll have

22  to go back and look at the agreement to see if I agree with

23  what you say.

24         Are you local counsel?

25         MR. CUNNINGHAM:  No.  I'm in California.  But,

1    Your Honor, if you're considering subsequent hearings, this

2    is an important case for us, and coming to Washington is

3    never a problem.

4              THE COURT:  It's a nice place to come to this time

5    of year.  I just don't want to, you know, cause you, you

6    know, any extra expense.

7              MR. CUNNINGHAM:  I appreciate it.

8              THE COURT:  But I think I should give Mr. Feitel

9    the opportunity because I am having some difficulty, and

10   maybe he is having some difficulty too, articulating why the

11   revelation of the facts in written form, if that becomes

12   public, whether -- how that creates a problem for his

13   client.  And, again, I'm having some concern about why the

14   entire plea agreement, if certain aspects of it are

15   redacted, how that creates a problem.

16             But, again, I've got to go back and look at the

17   agreement, which I haven't looked at for some time, and I

18   think in fairness to his client, I've got to give him the

19   opportunity to seek to articulate to me why revelation of

20   the facts, in and of themselves, would create a problem.

21             So he says he needs until next Wednesday -- that's

22   fine -- wherein he'll either file something ex parte setting

23   forth why he believes revelation of the facts would create a

24   problem for his client or whether, after further reflection,

25   he would agree that it can be released.  But, again, I've

1    got to look very closely at the agreement because I'm just

2    having some difficulty understanding why, with certain

3    redactions, it will be a problem.

4              MR. CUNNINGHAM:  I appreciate that.  Would it make

5    sense to set a further hearing and perhaps where the

6    Reporters motion would be resolved at the same time?

7              THE COURT:  Yes.  We'll let the Reporters know so

8    that they can be present at that time so we can resolve this

9    matter once and for all.

10             Next Wednesday is the 13th.  I'm available on the

11   afternoon of the 15th.  I'm also available on the afternoon

12   of the 18th.

13             MR. CUNNINGHAM:  The 15th is much better for me.

14             THE COURTROOM DEPUTY:  Judge, we're supposed to

15   have --

16             THE COURT:  The 15th?

17             THE COURTROOM DEPUTY:  No, the 18th is the start

18   of a trial.

19             THE COURT:  Okay.  The 15th?

20             MR. FEITEL:  Your Honor, I have a sentencing in

21   front of John Gleeson in the Eastern District of New York on

22   the 15th, and I'm scheduled to be in a secret -- in a

23   heretofore secret meeting out of the country on the 18th

24   with law enforcement agents for the Eastern District of New

25   York.

```
1                THE COURT:  The 22nd?

2                MR. FEITEL:  I'm supposed to be in -- I know it

3       seems odd.  I'm supposed to be in another meeting out of the

4       country on the 22nd.

5                THE COURT:  The 29th?

6                THE COURTROOM DEPUTY:  The 29th?

7                MR. FEITEL:  That's fine.

8                THE COURT:  The Friday.  It's the week that's

9       Memorial Day Weekend.

10               THE COURTROOM DEPUTY:  No, Memorial Day weekend is

11      the 22nd.

12               MR. FEITEL:  That's why I scheduled my meeting on

13      the 22nd.

14               THE COURT:  The 29th?

15               MR. FEITEL:  The 29th is good for me, Your Honor.

16               MR. LAYMON:  That's fine, Your Honor.

17               MR. CUNNINGHAM:  I can do the 29th.

18               THE COURT:  Okay.  We'll set the 29th.  I have a

19      9:00, so we'll set this for 10:00.  Is that good, or later?

20      I'm free all day except for 9:00.

21               MR. CUNNINGHAM:  10:00 would be great.

22               THE COURT:  10:00.  Thank you.

23               MR. FEITEL:  Thank you, Your Honor.

24               MR. CUNNINGHAM:  Thank you.

25               THE COURT:  We will check -- the clerk's going to
```

1      check to see if she can find the official documents that

2      should be a part of the record, the plea agreement and the

3      factual scenario.  It's got to be somewhere.

4              MR. CUNNINGHAM:  Thank you.

5                  (Whereupon the hearing was

6                  concluded at 9:52 a.m.)

7

8          **CERTIFICATE OF OFFICIAL COURT REPORTER**

9

10             I, LISA A. MOREIRA, RDR, CRR, do hereby

11     certify that the above and foregoing constitutes a true and

12     accurate transcript of my stenographic notes and is a full,

13     true and complete transcript of the proceedings to the best

14     of my ability.

15         Dated this 13th day of May, 2015.

16

17                      /s/Lisa A. Moreira, RDR, CRR
                        Official Court Reporter
18                      United States Courthouse
                        Room 6718
19                      333 Constitution Avenue, NW
                        Washington, DC 20001
20

21

22

23

24

25