Leave to file granted

*Reggie B. Walton*

August 31, 2020

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

United States of America,

      v.

Rodrigo Tovar Pupo

No. 1:04-cr-00114-RBW-9

1:19-cv-00754-RBW

### PETITION FOR A WRIT OF CORAM NOBIS

Defendant/Petitioner Rodrigo Tovar Pupo, acting pro se, respectfully moves this Court for a petition for writ of coram nobis.

On March 12, 2019 Petitioner filed a motion to VACATE (Section 2255) and a brief in support of July 15, 2019. Petitioner asked the Court to reopen discovery. United States Government attorneys responded and a reply by Petitioner was filed on December 6, 2019.

Petitioner is set to be freed by September, 2020 and extradited back to the Republic of Colombia. Petitioner continuously has stated that by filing his 2255 Motion he was not seeking a reduction of sentence but to withdraw the Plea Agreement he was coerced and tricked into signing because he is not guilty of trafficking drugs into the United States of America.

Because his sentence will be done by September, 2020, Petitioner asks this Court to convert his motion to VACATE (Section 2255) into a Petition for a Writ of Coram Nobis.

The Writ of Coram Nobis is filed and considered to amend errors or mistakes once the Petitioner has done his full sentence.

Petitioner pleads this Court to convert his Section 2255 Motion into a Petition for Coram Nobis on the same grounds and supporting brief filed in support of his Motion to VACATE. This Court has jurisdiction and discretion of issuing the Writ of Coram Nobis to make justice to Petitioner.

Submitted today ____11____ of __August__, in the year 2020.

*Rodrigo Tovar Pupo*
Rodrigo Tovar Pupo, pro-se
80517-004
LSCI Allenwood
P.O. Box 1000
White Deer, PA 17887



RECEIVED
Mail Room

AUG 1 4 2020

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Document 59?

United States of America

v

| No. 1:04-CR-00114-9

Rodrigo Tovar Pupo

---

BRIEF IN SUPPORT OF
MOTION TO VACATE
(§2255)

COMES Defendant Rodrigo Tovar Pupo, acting Pro se and files this Brief
in Support of the Motion to Vacate his Sentence.

Defendant Rodrigo Tovar Pupo attests to the following:

Defendant Rodrigo Tovar Pupo was part of a self-defense group formed
around the 1970's to "protect Colombian citizens from guerrilla organizations
such as Colombian Revolutionary ARmed Forces) (Fuerzas Armadas Revolucionarias
de Colombia - "FARC"), and of Liberation Popular Army (Ejercito Popular de Liberacion "EPL").
and ELN (Ejercito de Liberacion Nacional).

The self-defense groups such as the one Defendant Tovar-Pupo belonged
were organized under the auspices of the government of Colombia, jointly with
the State Department of the United States, the CIA, and other institutions
of the US Government (not solely the government of Colombia) to pursue a counter
offensive against the FARC and ELN for geopolitical forces to avoid FARC or

1

RECEIVED
Mail Room

AUG 1 4 2020

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

ELN to overthrow the government of Colombia and establish a leftist government possibly aligned to Cuba, Soviet Unition and/or China.

Those self-defense groups were organized to fight the left-wing guerrilla groups and help the Colombian military in their counter-insurgency operation, as well as provide self-defense to cattle ranchers and the farmers in the regions that were subject to FARC or ELN attacks.

It is well known that in many of the regions either controlled by FARC or ELN or those controlled by the self-defense groups, cocaine growing, manuracturing, transportation and commerce were going on; before 1996 form of the organization, until they were disolved through peace treaty with the governments of Colombia supported by the USA, were inolved in the support of the counter-insurgency struggles. So, when in 2000 "the United States D.E.A initiated an investigation of the self-defense groups such as those of Magdalena and Guajira", the United States Government and the government of Colombia were very well aware of the drug-trafficking in those areas by drug cartels.

Defendant Rodrigo Tovar became a member in 1996 of the Peasant's Defense forces of Cordoba and Uraba, operating in northwestern Colombia. By 1999 Tovar-Pupo had become one of the leaders of the selfe defense group. It is a well- known fact that in order to raise revenue to fund its self-defense activities, the ACCU as well as other groups implemented a policy of taxing participants in the cocaine production and distribution process. These facts were well-known to the government of Colombia and the U.S.

The taxing of participants in the drug trafficking was known as a "war tax" by the self defense groups. The war tax was levied on every shipment of drugs passing through the territories controlled by the self-defense groups, who offered protection for the drug dealers against FARC or ELN. The real

2

fact is that all people living in a territory controlled by a self-defense group had to pay a "war tax" including traffickers of drugs, no matter the destination of drugs.

For the self-defense groups and for Defendant Tovar-Pupo, it did not matter where the drugs were finally taken to. There was no special recognition by the groups that any of the drugs were taken into the U.S. mainland. In reality, it didn't matter and Defendant didn't know or was not interested in the final destination of the drugs. What mattered was that the drugs were taken through a territory controlled by the self-defense group and thus, subject to tax. All economic activities, drugs or any other item was subject to the "war tax." It had nothing to do with drug activity.

There was never a conspiracy with the elements bringing the drugs into the US and those were separate groups belonging to drug cartels and no relation with the self-defense group that Defendant belonged to. Defendant's group never engaged in cultivation of cocaine, manufacturing of cocaine, transport or deliver; just taking the shipments through its territory.

In May 12, 2008, Defendant was taken by the Government of Colombia when the disarmament of the self-defense groups was taking place, and was sent into the United States to be prosecuted. It is important to understand that the self-defense group to which Tovar-Pupo belonged was de-mobilized and no longer engaged in controlling territory or taxing drug elements. Second, it is important to understand that there was no treaty of extradition between Colombia and the United States at that time, Colombian constitution dropped extradition at 1991 and since 1998; but the so-called extradition was done by executive order from President of Colombia (Barco) directing the taking of Colombian citizens into U.S. custody.

After being taken to the United States, Tovar Pupo retained Mr. Joaquin Perez as his attorney (together with Attorney Heather Shaner). Attorney Perez

3

Mr. Perez became involved in Tovar Pupo's case because he was attorney for Hughes Rodriguez family in Colombia who contacted Defendant's father and suggested Attorney Perez to talk to Tovar Pupo and offer his services as an attorney. Another issue is that Mr. Perez defended Yuri Valde Blanquez, a well-known drug dealer, and then told Tovar Pupo that Yuri Valde Blanquez would testify against Tovar-Pupo in a supposed testimony stating that he was provided concealing by Tovar Pupo. This was completely false as nothing of this sort happened. Tovar Pupo never received any drugs from anyone, nor ever engaged in drug dealing of any kind. This is evidence of the huge conflict of interest that Mr. Perez had with Tovar Pupo.(1)

Also, although Tovar Pupo's attorney was Ms. Shaner, Mr. Perez periodically visited Tovar-Pupo while he was in jail awaiting trial, to press Tovar-Pupo into signing the plea arguing that the prosecutor and US Government allowed him to talk to Tovar-Pupo to "offer him comfort." It is also an incredible conflict of interest that prosecutor Faitel, through his conversations with Mr. Perez, knew everything that Tovar Pupo was telling Mr. Perez.

Here, it is important to state that prior to signing the guilty plea, Defendant Tovar Pupo has always protested that he was NOT guilty of conspiracy to import drugs into the United States and still stands by this. Despite Tovar-Pupo's insistence of his innocence, his attorney coerced him into signing a plea agreement, whereby he plead guilty to drug trafficking. Immediately, Defendant voiced his wish to withdraw his guilty plea. What is to be considered here with preoccupation and concern by this Court is that Defendant was advised in jail by other inmates of the consequences of his guilty plea agreement. This is not a unique case, because it has become common that defendants tend to get better advice from other inmates than they do from their

(1) Yuri Valde Blanquez had an order of extradition in Colombia and Perez told Tovar-Pupo that he would testify that Tovar -Pupo was concealing Valdes Blanquez when it was false.

attorneys or the Court. It is shameful that this is going on; why it takes a defendant to enter prison to be properly advised by other inmates? Why is it that most attorneys fail to advise their clients in an appropriate manner? Why is it that over 90% of defendants in federal court plead guilty, signing a plea agreement written only by the government, wityhout their attorney's input? Why have many attorneys failed to be effective and place themselves in the almost malpractice performance situations by failing to properly advise their clients?

In this case, Defendant immediately, and even before signing an agreement pleading guilt to something he was convinced he was not guilty of. This became a travesty of Justice.

On March 19, 2014, the proceedings on the motion to withdraw the guilty plea began. The defense noted that Tovar Pupo had been "protesting his innocence" for quite some time. It was further noted that the Defendant did not have the intent or the action to be guilty of conspiracy and that his role was to collect taxes from both legal and illegal businesses, which included drug traffickers.

Ms. Shaner, his attorney, acknowledged that she received a letter from Tovar-Pupo prior to his entering a guilty plea in which Tovar Pupo stated he was not guilty of conspiracy to import drugs.  He further stated that he wanted to send his positions in the event he chose to go to trial. On cross, Ms. Shaner testified that he did not want to plead guilty. She further noted that he did not think of himself as a drug dealer. Further, Ms. Shaner recalled that the day before Appellant pled guilty, there was an argument between Appellant and Attorney Perez. The argument was over what was in Appellant's best interest. Perez was visibly frustrated.

On questioning by the district judge as to why Tovar Pupo entered a plea of guilty when he believed he was not a drug dealer, she responded, "I think the way it was crafted was that by collecting the taxes on drug dealers and keeping the roads clear in the area he was providing a service to the drug dealers." The district judge asked, "So you're saying he didn't think that even though he was collecting a tax he didn't think that was in some way assisting the drug dealers in carrying out their activity?" Ms. Shaner replied, "Correct." How could it be of assistance to someone to plan an "extortion"?

Michael Frisch was qualified as an expert in attorney professional ethics. Based on the hypothetical presented to him, he opined that by Perez representing Appellant, while at the same time he represented two other defendants who were cooperating and would testify against Appellant, constituted an actual conflict.

Mr. tovar Pupo testified that in August 1996, he decided to join forces to protect those in rural areas from subversive actions. A war tax was imposed on all economic activities - both legal and illegal. After receiving an order from his commander, Tovar Pupo had to determine what activities were taking place, and then had to decide how the tax would be imposed and collected.

Appellant testified that he met with Perez 10 to 15 days after arriving in the U.S. He was familiar with Perez because Perez was Carlos Castano's superior commander - attorney, advisor and lobbyist both Colombia and USA. Following a hearing (on March 26, 2009) where potential conflicts were discussed, Tovar Pupo questioned Perez about the situation. Perez assured him that the other two defendants would not testify against him.

On July 21, 2009, Appellant was to enter a plea of guilty. He refused to enter the courtroom He advised counsel that he would not plead guilty. He did offer to plead guilty to collecting taxes. Appellant further testified that he paid Perez a total of $390,000.

The hearing continued on March 20, 2016. The parties requested to suspend the cross examination of Tovar Pupo so Perez could testify.

Mr. Perez testified he was familiar with the District of Columbia rules of ethics. Even though Rule 1.5 required he have written engagement agreement and he was aware of the rule, he had no such agreement with Appellant. His failure to have an agreement is because it is not his practice to do so. He did not recall how much he was paid. He further testified that his secretary contacted the clerk requesting that the plea set for July 24, 2009, be taken off the calendar. The reason was that Appellant was requesting changes in the Statement of Facts. Indeed, according to Perez, Appellant requested changes numerous times.

The cross examination of Appellant continued. And the case was continued to March 21, 2014. he said he felt "completely demoralized." The district judge asked why Appellant did not say anything to the Court at the time of the plea. He responded that at a previous hearing he raised his hand to talk to the Court but the marshal lowered his hand. Ms. Shaner and Mr. Perez said he could not talk to the judge. The judge also advised that he should speak only through counsel and that he should listen to his lawyers.

At the close of the hearing on that day, the district judge explained that he had "real serious concerns."

Mr. Perez's testimony continued on April 7, 2014. Perez testified how Robert Fietel became involved in the case. Perez further acknowleged an email sent by him to the government that one of the cooperating defendants he represented could "play a role in undermining" Appellant's claims. He also blamed the government for failing to do as promised as part of the cooperation agreement

7

which was part of the plea agreement. Robert Faitel was a prosecutor and using undue contact with Attorney Perez (when Perez was not Tovar Pupo's attorney any longer). Later Mr. Faitel tried to become Tovar Pupo's attorney. It is significant that hughes Rodriguez, charged with drug trafficking, saw his case dismissed but this was not allowed for Tovar Pupo.

Clara Iriarte testified on April 8, 2014. She was an assistant, paralegal, and chauffeur for Perez. She sensed friction between Perez and Tovar Pupo regarding the plea. According to her testimony, Appellant consistently maintained he would not plead to drug trafficking.

The district court issued a Memorandum Opinion, denying the motion to withdraw the guilty plea, on November 20, 2014. Based on the record, the district ruled "Mr. Perez labored under an actual conflict of interest when he advised the defendant to accept the guilty plea. The district court further ruled that under the circumstances of the case, "the defendant could not have const-itutionally waived his right to conflict-free counsel." The court then ruled that Tovar Pupo "had not demonstrated that his conflict adversely affected Mr. Perez's representation of him." The court first found that there was nothing about the Rule 11 colloquy that showed that Appellant was adversely affected by the conflict. The court then held that Appellant had no viable claim of innocence.

"In Cuyler v. Sullivan, 446 US 335, 349-351, 100 S.Ct. 1708, 1718-120, 64 L.Ed.2d 333 (1980), the Supreme Court recognized that a defendant's Sixth Amendment right to effective assistance of counsel may be violated when an actual conflict of interest adversely affects the adequacey of the defendant's representation. In that event, prejudice will be presumed if the defendant demonstrates that counsel actively represented conflicting interestes and

that the conflict adversely affected his attorney's performance. In order
to present a valid Cuyler claim, this court requires a defendant to show that
his counsel advanced his own, or another client's, interest to the detriment
of the defendant." United States v. Tyler, 139 F.3d 924, 930 (DC. Cir. 1998).

The district court placed a great deal of weight on Appellant's Rule
11 plea colloquy. But what the Court ignored was Tovar Pupo's responses to
the court's own questions at the evidentiary hearing. Appellant testified
that he did not say anything regarding his plea because he was advised by
counsel and the court not to say anything directly to the court. Moreover,
witness testimony showed that Appellant was obviously distressed about pleading
guilty, both before and after the plea. he repeatedly advised his attorneys
and the paralegal that he was not guilty of any drug offenses. Despite this,
he was consistently pressured by his attorneys to enter a guilty plea.

"The fact that the Appellant himself in questioning by the Court denied
that there had been any prosecutorial promises to induce the plea does not
stop him from seeking to withdraw his plea. The Defendant's personal responses
to Rule 11 inquiries are understandably likely to be inaccurate and somewhat
confused..." United States v. Roberts. 570 F.2d 999, 10007 (DC Cir. 1977).
Based on the record, it was error for the district court to decide the issue
solely on the plea colloquy and, at the same time, ignore testimony that clearly
refuted what the Appellant stated at the plea.

To prove that a defendant entered into a narcotics conspiracy under 21
USC §846, the government must prove that he did so knowingly. United States
v. Childress, 58 F.3d 693. 708-09 (DC Cir. 1995). Knowledge alone, however,
is not enough. Id. The government must also prove that the Defendant had the
specific intent to further the conspiracy's objective." Id. at 708; United
States v. Tarantino, 846 F.2d 1384. 1392 (DC Cir. 1988); see also Ingram v.

9

United States, 360 US 672, 678-79 S.Ct. 1314, 3 L.Ed.2d 1503 (1959) (holding that "[c]onspiracy to commit a particular substantive offense cannot exist without at least the degree of criminal intent necessary for the substantive offense itself." (internal quotation marks omitted)).

In United States v. Gaskins, 690 F.3d 569, 577 (DC Cir. 2012), this Court held that evidence was insufficient to prove that a defendant knowingly joined the conspiracy or intended to further its aims. The Court noted that there was no evidence the defendant ever discussed drugs, distributed drugs, or was in the presence of drugs connected to the conspiracy. See also United States v. Pardo, 636 F.2d 535, 549 (DC Cir. 1980)("We have repeatedly held that mere presence of the accused on the premsies, or simply his proximity to the drug, does not itself" establish constructive possession. Nor is mere association with another, standing alone, enough even when the other is known to possess the drug. In other words, there must be some action, some word or some conduct that links the individual to the narcotics and indicates that he had some stake in them, some power over them."

In this case, there was absolutely no evidence that Appellant intended to further the aims of the drug conspiracy. He never discussed drugs. He never was part of the distribution of drugs. In fact, it does not appear he ever saw any drugs. he certainly did not profit from drug trafficking.

The offer and acceptance of a plea agreement has become similar to "adhesion contracts", but at least "adhesion contracts" in a civil procedure are looked upon with doubt and strict scrutiny by our Courts and they are always taken against the writer. Not in a plea agreement where the Courts and the US Government and even some defense attorneys give sanctity investiture to them. It is about time that a court start looking at those plea agreements as a doubtful way of a defendant pleading guilty because in most instances even if the defendant admits to be guilty to a crime as depicted in statute.

10

There are statements on the plea that most defendants would not agree to their culpability on those issues. Those issues, if at all relevant, should be proven by evidence beyond a reasonable doubt and most times, not even supported by a preponderance of evidence, they are admitted. If the Defendant claims he or she did not do or is not guilty of everything contained in the plea, then he has to choose to go to trial, and our system nowadays that means a much harsher sentence. In fact, this is a violation of the right of an accused not to incriminate himself or herself by his or her admission, in violation of the Fifth Amendment.

## DISCUSSION OF GROUNDS

The leading case in a 2255 motion is given by the Strickland case. Strickland presents a two-pronged analysis to determine if there was ineffective counsel. The first is a performance of the attorney fell below the standard of the profession in similar circumstances. It has to be demonstrated that attorney failed to represent client by performing below the standard of other attorneys in similar circumstances.

Second prong is that it has to be demonstrated that the performance of the attorney affected in a very negative way, the rights of the defendant and if it was not because of the ineffective counsel the results would have been significantly different and would have favored the Defendant.

The Due Process Clause prohibits the Government from "taking away someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invited arbitrary enforcement." Johnson, 576 US at 380. The prohibition against undue processes in criminal proceedings is "a well recognized requirement, consonant alike with ordinary notions of fair play and the settled rules of law." Connally v General Const. Co., 269 US 385, 391 (1926). The doctrine rests on two justifications. First, it ensures that people receive "fair notice of what is prohibited." United States v Williams, 533 US 285, 304 (2008). Second, it safeguards the integrity of the judicial system by ensuring that criminal adjudications are not conducted in an arbitrary manner and that the terms of imprisonment are not imposed "on an adhoc and subjective basis." Grayned v City of Rockford, 408 US 104, 109 (1972).

"These principles apply not only to statutes defining elements of crimes, but also to statutes fixing sentences." Johnson, 576 US at 380.

A statute fixing a sentences imposes no less a deprivation elements of crimes, but also to statutes fixing sentences." Johnson, 576 US at 380.

A statute fixing a sentence imposes no less a deprivation of liberty than does a statute defining crime, as our 6th Amendment Jurisprudence makes plain. See Apprendi v New Jersey, 530 US 466, 490 (2000).

"A defendant who is sentenced under a purely discretionary regime does not face the prospect of "arbitrary enforcement" by the sentencing judge, Kolender, 461 US at 358; rather, he faces a fact- and context-sensitive determination informed by the exercise of reasoned judgment. A defendant sentenced pursuant to an impossibly vague Guideline, by contrast, is put in an untenable position.

The "lodestone" of his sentence--the baseline against which the district court
will assess his characterisitics and his conduct--is set by a rule that is
impossible to understand. Such a proceeding is the antitheseis of due process.
See Giaccio v. Pennsylvania, 382 US 399, 403 (1966)("implicit in [due process]
is the premise that legal standards that courts must enforce.").  It is not
reliance on an impenetrable rule as a baseline for the exercise of that discretion.
Reliance on a rule of this kind, whether set out in a statute or in a Guidelines,
does not comport with "ordinary notions of fair play." Johnson, 576 US at
381  . )

It was noted that "under the Due Process Clause of the Fifth Amendment
and the notice and jury trial guarantees of the Sixth Amendment, any fact
(other than prior conviction) that increases the maximum penalty for a crime
must be charged in an indictment, submitted to a jury, and proven beyond a
reasonable doubt." Id., at 243, n.6, 143 L Ed 2d 311, 119 S.Ct. 1215.

In his 1881 lecture on the criminal law, Oliver Wendell Holmes, Jr. observed:
"The law threatens certain pains if you do certain things, intending thereby
to give you a new motive for not doing them. If you persist in doing them,
it has to inflict the pains in order that its threats may continue to be believed."
New Jersey threatened Apprendi with certain pains if he unlawfully possessed
a weapon and with additional pains if he selected his victims with a purpose
to intimidate them because of their race. As a matter of simple justice, it
seems obvious that the procedural safeguards designed to protect Apprendi
from unwarranted pains should apply equally to the two acts that New Jersey
had singled out for punishment. Merely using the label "sentence enhancement"
to describe the latter surely does not provide a basis for treating them differently.

At stake in this case are constitutional protections of surpassing importance:
the proscription of any deprivation of liberty without "due process of law",
Amdt. 14, and the guarantee that "[i]n all criminal prosecutions, the accused

13

shall enjoy the right to a speedy and public trial, by an impartial jury,"
Amdt. 6. Taken together, these rights indisputably entitle a criminal defendant
to " a jury determination that [he] is guilty of every element of the crime
with which he is charged, beyond a reasonable doubt." <u>United States v. Gaudin</u>,
515 US 506, 510, 132 L.Ed.2d 182, 113 S.Ct. 2078 (1993): <u>Winship</u>, 397 US, at
364, 25 L.Ed.2d 368, 90  S.Ct. 1068 ("[T]he Due Process Clause protects the
accused against conviction except upon proof beyond a reasonable doubt of
every fact necessary to constitute the crime with which he is charged.").

As the US Supreme Court, unanimously, explained in <u>Gaudin</u>, 515 US at
510-511, 132 L.Ed.2d 444, 115 S.Ct. 2310, the historical foundation for our
recognition of these principles extends down centuries into the common law.
"[T]o guard against a spirit of oppression and tyranny on the part of rulers,"
and "as the great bulwark of [our] civil and political liberties," 2J.Story,
Commentaries on the Constitution of the United States 540-541 (4th ed. 1873),
trial by jury has been understood to require that "the truth of every accusation,
whether preferred in the shape of indictment, information, or appeal, should
afterwords be confirmed by the unanimous suffrage of twelve of [the defendant's]
equals and neighbours..." 4 W. Blackstone, Commentaries on the laws of England
343 (1796) (hereinafter Blackstone) (emphasis added). See also <u>Duncan v. Louisiana</u>,
391 US 145, 151-154, 20 L.Ed.2d 491, 88 S.Ct. 1444(1968).

Equally well-founded is the companion right to have the jury verdict
based on proof beyond a reasonable doubt. "The 'demand for a higher degree
of persuasion in crimnal cases was recurrently expressed from ancient times,
[though] its crystallization into the formula "beyond a reasonable doubt"
seems to have occurred as late as 1798. It is now accepted in common-law jurisdiction
as the measure of persuasion by which the prosecution must convince the trier
of all the essential elements of guilt.' C. McCormick, Evidence §321, pp 681-
82 (1954); see also 9 J. Wigmore, Evidence §2497 (3d ed. 1940)." <u>Winship</u>,
397 US, at 361, 25 L.Ed.2d 368, 90 S.Ct. 1068. We went on to explain that

14

the reliance on the "reasonable doubt" standard among common-law jurisdictions "reflect[s] thus, a profound judgment about the way in which law should be enforced and justice administered.'" Id. at 361-362, 25 L.Ed.2d 368, 90 S.Ct. 1068 (quoting Duncan, 391 US, at 155, 20 L.Ed.2d 491, 88 S.Ct. 1444).

Any possible distinction between an "element" of a felony offense and a "sentencing factor" was unknown to the practice of criminal indictment, trial by jury, and jugment by Court as it existed during the years surrounding our Nation's founding. As a general rule, criminal proceedings were submitted to a jury after being initiated by an indictment containing "all the facts and circumstances which constitute the offense, ...stated with such certainty and precision, that the defendant...may be enabled to determine the species of offense they constitute, in order that he may prepare his defense accordingly...and that there may be no doubt as to the judgment which should be given, if the defendant is convicted." J. Archbold, Pleading and Evidence in Criminal Cases 44 (15th ed. 1862). The defendant's ability to predict with certainty the judgment from the face of the felony indictment flowed from the invariable linkage of punishment with crime. See 4 Blackstone 369-370 (after verdict, and barring a defect in the indictment, pardon or benefit of clergy, "the court must pronounce that judgment, which the law hath annexed to the crime".

In sum, the reexamination of the case in this area, and of the history upon which they rely, confirms the opinion that was expressed in Jones. Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt. With that exception, we endorse the statement of the rule set forth in the concurring opinions in that case:

"[I]t is unconstitutional for a legislature to remove from the jury the assessment of facts that increase the prescribed range of penalties to which a criminal defendant is exposed. It is equally clear that such facts must be established by proof beyond a reasonable doubt." 526 US at 2562-253, 143 L.Ed.2d 311, 119 S.Ct. 1215 (opinion of Scalia, J.).

Appellant objects to the voluntariness of the July 22, 2009, blindfold and involuntary plea of guilty because counsel of record, Mr. Joaquin Perez, knew that Appellant was never indicted in the government's superseding indictment, but coerce, force and threaten Appellant to enter a blindfold plea of guilty to an unindicted offense. United States v. Freeman, 818 F.3d 175, 179 (5th Cir. 2016); United States v. Giraldot Serna, 118 F.Supp. 3d 377, 381 (DC Cir. 2015).

During the July 22, 2009 plea colloquy proceedings the following took place:

> Q  Okay.  I'm going to review with you the document to make sure that we have the same understanding of what the agreement is. As I understand in this case you will plead guilty to Count one of the superseding indictment which charges you with the offense of conspiracy to manufacture and distribute 5 kilograms or more of cocaine; is that right? Is that what you're going to plead guilty to?

Appellant states that the government's proffered facts to establish the elements of the uncharged conspiracy of the government's March 2004 superseding indictment and reasserts that it was error for the district court to accept his July 22, 2009 blindfold and involuntary plea of guilty for two reasons. First, Appellant was never charged by the government in its March 2004 superseding indictment and two, the facts Appellant stipulated during the July 22, 2009 plea colloquy proceedings did not demonstrate that Appellant knowingly manufactured, imported and distributed 150 kilograms of cocaine into the United States. United States v. Angeles-Mascote, 206 F.3d 529 (5th Cir. 2000); see also United States v. Freeman, 818 F.3d 175 (5th Cir. 2016).

Rule 11 (b)(3) additionally requires that "[b]efore entering judgement on a guilty plea, the court must determine that there is a factual basis for the plea," Fed.R.Crim.P.11(b)(3), and in challenging the Court's conduct of the plea proceedings, Appellant's filings focus on the Court's obligations under Rule 11(b)(3). The Supreme Court has explained that "[r]equring this examination of the relation between the law and the acts the Appellant admits having committed is designed to protect a defendant who is in the position of pleading voluntarily with an understanding of the nature of the charge but without realizing that his conduct does not actually fall within the charge." McCarth v. United States, 394 US 459, 468 S.Ct. 1166, 22 L.Ed.2d 418 (1969).

The court described the erroneous factual basis as follows:

Q   Now I also understand that you are agreeing that under the United
    States Sentencing Guideline that you are accountable for more than
    150 kilograms of cocaine; is that right?
A   Yes, Your Honor, based on charging for taxes over those quantities
    and even more than that, Your Honor.
Q   Now as a result of you're admitting that you're accountable for that
    amount of drugs that results under the United States sentencing guidelines
    with your base offense level being 38. You should understand by admitting
    that you're accountable for that amount of drugs it does have an impact
    on what you base level under the guidelines will be. The more drugs
    you are accountable for the higher your base offense level will be.
    And here because of the amount that you're admitting you're accountable
    for the base offense level is 38. Do you understand that?

Q   Now I have also this Statement of Facts with some additions to it.
    And I also see that you have signed that document on page six, next
    to the last document, which is an acknowledgment that the information
    contained in the Statement of Facts is in fact true and accurate.
    Did you in fact, sign this?
A   Yes, Your Honor, I signed it.
Q   And did you sign it because it is, in fact, true and accurate?
A   Yes, Your Honor. I had the opportunity to meet with the prosecutors
    and discuss some of the elements, but I did sign it and knowing that
    these are the facts that led to my responsibilty, Your honor.
Q   And are you admitting that you, in fact, did those things set forth
    in that document.

Title 21, United States Code, Section 959(a) requires proof beyond reasonable doubt that defendant actually knew or intended that controlled substance he

distributed or manufactured would be illegally imported into the United States;
therefore, by its terms, this provision requires proof of actual, not constructive,
knowledge; accordingly, in order to obtain conviction for offense under Section
959(c), the government has to prove defendant's actual knowlege or intent
beyond reasonable doubt. United States v. Romero-Padilla, 583 F.3d 126 (2nd
Cir. 2009).

Appellant states the government's theory of his claim to the Honorable
Walton's participation in the parties plea discussions on July 22, 2009 plea
colloquy proceedings and asks this Court to reject the government's findings
because under the provisions of Federal Rules of Criminal Procedure 11(c)(1),
the district court plainly erred when it participate during the plea discussions
by informing Appellant to plea to an uncharged offense mentioned in the superseding
indictment, construing the elements of Appellant's tax collections to reflect
that Appellant manufacture, imported and distributed 150 kilograms of cocaine
into the United States. United States v. Daviln, 664 F.3d 1355.

Q   And I also understand that you are agreeing that an additional
    one level increase is appropriate because the quantity of the
    amount of drugs that you were involved in was extraordinary, well
    above ten times required for level 38; is that correct?
A   Yes, Your Honor, based on the taxes that were levied on those quantities.
Q   I also understand that you are agreeing to an additional two level
    increase of the offense level because you possessed a firearm during
    the time that this activity was taking place; is that right?
A   Yes, Your Honor, consistent with my responsibility, my responsibility
    due to the conflict that exists in my country and in which I participated
    in.

Appellant objects to the government's conclusion of the district court's
accuracy of the record and asks this Court to reject said conclusion because
it was error for the district court not to timely file the July 22, 2009,
blindfold plea into the record until one year later, in violation of Federal
Rule of Criminal Procedure 11(c)(1), that constitutes not only fraud but structural
error in violation to Appellant's constitutional right to due process under
the Fifth Amendment to the United States Constitution. United States v. Oakar,

18

111 F.3d 146, note 3 (App. D.C. 1997) see also; Severin v. Parish of Jefferson,

357 Fed.Appx. 601, 603 (5th Cir. 2009).

A convicted defendant seeking a constitutional remedy for his defense
lawyer's conflict of interest "must demonstrate that an actual conflict of interest
adversely affected his lawyer's performance." Cuyler v. Sullivan, 466 US 335,
348 (1980). If this were the standard applicable to Tovar Pupo's motion to
withdraw his guilty plea, the Court might be called upon to resolve factual
disagreements between Tovar Pupo and his former lawyer, Joaquin G. Perez,
as well as to resolve uncertainties about what inferences to draw from the
facts.

Tovar Pupo has moved pre-sentence to withdraw his guilty plea. Although
the government assumes that Tovar Pupo must "show [that] his counsel was
constitutionally deficient" under Cuyler v. Sullivan (Govt. Response at 4),
my understanding is that the Court has more discretion under the applicable
standard. See United States v. Berkeley, 567 F.3d 703, 708 (DC Cir. 2009)
("A defendant may withdraw a guilty plea prior to sentencing if he 'can show
a fair and just reason for requesting the withdrawal.'")(quoting Fed.R.Crim.P.11-
(d)(2)(B)); United States v. Taylor, 139 F.3d 924, 929 (DC Cir. 1998)("Withdrawal
of a guilty plea prior to sentencing is to be liberally granted"). Tovar Pupo
need not necessarily show that his defense lawyer's ethical deficiencies amounted
to a constitutional violation, as he would post-conviction. See, e.g. United
States v. Bonilla, 637 F.3d 980 (9th Cir. 2011); United States v. Lozano,
No. 4:CR-06-0175-06, 2007 US Dist.LEXIS, at 5-6 (MD.PA 2007).

In exercising discretion whether to disqualify defense counsel because
of a conflict of interest, federal courts consider not only whether the defendant's
representation would likely be unconstitutional under Cuyler v. Sullivan,
but also the judiciary's "independent interest in ensuring that criminal trials
are conducted within the ethical standards of the profession and that legal
proceedings appear fair to all who observe them." Wheat v. United States,

486 US 153, 160 (1988). It should be assumed that this same judicial interest
may also be relevant to the court in exercising discretion whether to permit
a defendant to withdraw his guilty plea under Rule 11(d)(2)(B).

Perez had a serious conflict of interest when he advised Tovar Pupo regarding
whether or not to plead guilty under the terms of the plea agreement that
Perez negotiated; that Perez did not obtain Tovar Pupo's "informed consent"
as required by the Washington DC Rules of Professional Conduct ("D.C. Rules");
and that the prosecution colluded in Perez's ethical impropriety. These opinions
are based on Perez's testimony, independently of Tovar Pupo's testimony and
correspondence.

The conflict arose out of Perez's concurrent representation of two other
defendants, Salvatore Mancuso and Hughes Rodriguez-Fuentes, who had pleaded
guilty and agreed to cooperate with government in exchange for leniency and
who were likely government witnesses against Tovar-Pupo if he proceeded to
trial. These basic facts are not in dispute. E.g., March 20, 2014 Tr. at 155-
56.

Both courts and federal prosecutors consistently recognize that a criminal
defense lawyer has a conflict of interest when a former or current client
is a potential witness in the case. Notably, the defense lawyer's conflict
is more severe where, as here, the government witnesses are the defense lawyer's
current clients, not former clients. Further, the defense lawyer's conflict
is more severe where, as here, the testifying clients have cooperation agreements
with the government.

In Tovar Pupo's case, the prosecution, which wanted Perez to represent
Tovar Pupo in order to facilitate plea negotiations, Apr. 7, 2014 tr. at 164,
minimized the significance of defense counsel's conflict. Far from seeking
Perez's disqualification, it assured Perez before he accepted the representation
that it would not object to Tovar Pupo's waiver of the conflict. Id. at 164.

The government then assured the Court in the March 26, 2009 status conference that Perez had only a "potential conflict" and that "if the case is resolved [by a guilty plea] that's a conflict that can be waived." Mar. 26, 2009 tr. at 3.

The ratification of Tovar Pupo's waiver without independent legal advice is remarkable in this case given not only that defense counsel had a serious conflict of interest that would ordinarily elicit a disqualification motion but also that the defendant faced serious charges, was a citizen of a foreign country, did not speak English, and had no prior experience with the US Criminal Justice process. Compare, e.g. United States v. Rahman, 861 F.Supp.266 (SDNY 1994).

The Court's Opinion that Perez's representation of the three cooperators would not entail a conflict of interest as long as the defendant pleaded guilty was significantly misleading. It is true that in most published decisions in which criminal defendants raise constitutional challenges to their convictions based on conflicts of interest, the defendant was convicted after a trial rather than a guilty plea. Therefore, when the claim is predicated on a defense lawyer's representation of a government witness, the typical allegation is that the lawyer "pulled his punches" in cross-examination to avoid misusing the witness's confidences or to avoid embarrassing the witness. But that is by no means the only risk to the quality of defense representation when a defense lawyer has a prior or current relationship with a witness. See, e.g. Lace v. United States, 736 F.2d 48, 50 (2d Cir. 1984), (noting that the defense lawyer appreciated the potential problem that would arise if his brother became a witness against the defendant, but "[a]pparently he did not appreciate the potential problem that could arise...if, as occurred, the adequacy of his advice concerning a guilty plea was challenged.").

For example, the Government may have sought to avoid public disclosure

of the nature and extent of the involvement of the US Government or the nature
and extent of the government in the Colombian civil war.

Although the government asserts that "Mancuso and Rodriguez...might have
benefitted more had the defendant opted for trial" (Govt. Response at 4)(emphasis
added), it does not acknowledge and take account of the above-described risks
attendant to testifying. The government submitted, however, that "credit for
cooperation leading to a guilty plea generally is treated less favorably than
credit for testifying at trial." The Govt. elicited Perez's concession that
Mancuso would "stand to earn" a greater benefit from testifying against Tovar
Pupo than by providing information leading to his guilty plea. Apr. 7, 2014
tr. at 99....But Perez volunteered that "[he] never wanted that to happen,"
which makes sense given not only the risks involved in testifying but also
the possibility of Tovar Pupo's acquittal which might cause the prosecution
to deem the cooperators' testimony unhelpful.

The prosecutors wanted a guilty plea, which they believed Perez could
facilitate. Apr. 7, 2014 tr. at 164. This is plain from the government's devotion
of substantial time and resources to plea negotiations, including the participation
of the Attorney General of the United States and outreach to authorities in
Colombia. Id. at 117-188 & 127. Logically, the prosecutors would reward its
cooperators most highly for assistance in achieving the government's objective.
Tovar Pupo testified that Rodriguez-Fuentes met with him, encouraged him to
plead guilty, and said that "if you accept that responsibility that would
benefit me." March 19, 2014 tr. at 117-18. This testimony is uncontradicted.
But leaving aside Tovar Pupo's testimony, one can infer that the cooperating
co-defendants consented to Perez's representation of Tovar Pupo, which was
for the limited purpose of plea negotiations. Apr. 7, 2014 tr. at 164, precisely
because they perceived it to be in their own best interest for Tovar Pupo
to plead guilty. Further, one can infer that the government authorized Rodriguez-

Fuentes to meet with Tovar Pupo to assist in securing Tovar Pupo's guilty
plea, not to thwart the government's objective by encouraging Tovar Pupo to
stand trial.

As noted, Perez had no intention of defending Tovar Pupo at trial but
from the outset would pursue only a negotiated plea agreement. Apr. 7, 2014
tr. at 164. Had Tovar Pupo resolved not to plead guilty, Perez's services
would not longer have been needed. There is nothing to suggest that, as required,
Perez explained the risks of limiting his representation and obtained Tovar
Pupo's informed consent. See D.C. Rules, Rule 1.2(c) ("A lawyer may limit
the objective of the representation if the client gives informed consent.")

If it was in the interest of Mancuso and Rodriguez-Fuentes for Tovar
Pupo to plead guilty, then Perez had an "actual" and serious conflict between
his duties of loyalty and competence to Mancuso and Rodriguez-Fuentes, on
one hand, and to Tovar Pupo, on the other. Perez did not limit his role to
conducting the plea negotiations and require Tovar Pupo to rely on unconflicted
counsel for legal assistance in evaluating proposed plea agreements. Rather,
Perez advised Tovar Pupo to plead guilty.

Perez "had lengthy discussions with Tovar Pupo about the possibility
of pleading guilty," Apr. 7, 2014 tr. at 95, and Perez advised [Tovar Pupo]
that it was in his best interest to work a plea and cooperation agreement."
Id. at 58; also see id. at 69; March 20, 2014 tr. at 163. Perez was ethically
obligated to give Tovar Pupo disinterested advice regarding whether to plead
guilty or to stand trial, but he could not do so because of his conflicting
loyalties to Mancuso and Rodriguez-Fuentes. Perez's duty to the cooperating
co-defendants was to help them avoid testifying at Tovar Pupo's trial by facilitating
Tovar Pupo's guilty plea. Perez would have been betraying them if he encouraged
Tovar Pupo to exercise his right to trial. In advising Tovar Pupo, Perez's
duty of loyalty to the cooperating co-defendants would have led him to understate

considerations that might weigh in favor of standing trial and overstate
considerations favoring a guilty plea.

Tovar Pupo's guilt was questionable and there was a "real issue in the
case [regarding] to what extent the government could prove culpability relying
upon two different theories; aiding and abetting and within the scope of the
conspiracy." Id. at 28. Tovar Pupo did not acknowledge his guilt but took
the position that he was "not a drug dealer" but "a patriot." The question
of whether to plead guilty was further complicated by: (1) Tovar Pupo's "concern
about his public image and legacy," (2) Pending lawsuits in Colombia and the
risk for imprisonment if he were to return to Colombia, and (3) Tovar Pupo's
unwillingness to admit to acts that he did not believe he had committed. Perez
himself believed that it "would not make any sense" for Tovar Pupo to plead
guilty absent "somewhat of an assurance from" the government that Tovar Pupo
would get a sentence reduction for providing substantial assistance.

Because Perez's duties to Mancuso and Rodriguez-Fuentes compromised hyis
ability to give disinterested advice to Tovar Pupo regarding whether to plead
guilty, Perez had a conflict of interest under Rule 1.7 of the D.C. Rules.
Under Rule 1.7(b)(2), a lawyer has a conflict of interest if the representation
"is likely to be adversely affected by representation of another client,"
as was the case here. In that event, under Rule 1.7(c), the representation
would be impermissible unless "[t]he lawyer reasonably believes that the lawyer
will be able to provide competent and diligent representation to each affected
client" and "[e]ach potentially affected client provides informed consent
to such representation after full disclosure of the existence and nature of
the possible conflict and the possible adverse consequences of such representation."

Likewise, Tovar Pupo plainly did not give "informed consent....after
full disclosure of the existence and nature of the possible conflict and the
possible adverse consequcnes of such representation." In his discussions with

Tovar Pupo, Perez never explained the risk that his advice would be compromised. On the contrary, Perez's professed belief was that he would not have a conflict if Tovar Pupo "worked out an agreement" to plead guilty, and Perez conveyed to Tovar Pupo that there was "a potential for conflict" only if Tovar Pupo went to trial. March 20, 2014 tr. at 153 & 162; Apr. 7, 2014 tr. at 93-94. Surprisingly, the prosecution did not provide the court any written guidance prior to the March 26, 2009 status conference. Then, at the conference, the prosecution endorsed Perez's position, mischaracterizing his conflict and failing to acknowledge its likely impact on Perez's advice regarding the crucial question whether to plead guilty. Consequently, the hearing regarding Perez's conflict of interest did not compensate for Perez's earlier failure to adequately explain the nature of his conflict and the possible adverse consequences.

Finally, it appears that the government tacitly colluded in the defense lawyer's ethical impropriety. See ¶¶ 16-19 & 27. Prosecutors have an "obligatio[n] to see that the defendant is accorded procedural justice." D.C. Rules, Rule 3.8, cmt. [1]. This includes an ethical responsibility not to exploit defense lawyers' conflicts of interest but rather to assist courts in responding appropriately to such conflicts. See, e.g. United States v. Iorizzo, 786 F.2d 52, 59 (2d Cir. 1986); Rael v. Blair, 153 F.3d 657, 663-64 (N.Mex 2007). Here, the prosecution affirmatively seeking to benefit from a conflicted defense lawyer's participation in plea negotiations, misleadingly characterized and minimized Perez's conflict of interest, omitting to acknowledge how Perez's conflict would impair his ability to give disinterested advice to Tovar Pupo regarding whether to plead guilty, and omitting to recommend that Tovar Pupo obtain independent advice regarding whether to waive the conflict.

Aside from the obvious conflict of interest and ineffective counsel of his attorneys; specifically Mr. Perez, due to his representation of three defendants in conflict with representing Tovar-Pupo, there is and was a major conflict of interest with Mr. Perez himself

Mr. Perez had been involved for a long time with the actions of the self defense group, ACCU, in Colombia that Mr. Tovar Pupo belonged to. Mr. Perez was deeply involved personally with every instance of the development and actions of this "self-defense group."

Mr. Perez actually suggested the "war tax" to this self-defense group. He was involved in providing counsel to the self defense group. Mr. Perez actually knew of the taxes to drug traffickers by this self-defense group but not Mr. Tovar-Pupo as stated.

Mr. Perez was afraid of Tovar-Pupo going to trial and discovering all the personal activities of Mr. Perez in all the self-defense activities of the group. Mr. Perez had a clear conflict of interest and that is why he made Tovar Pupo sign a plea in spite of all the protests of Tovar Pupo about not accepting responsibility for the charges of drug trafficking into the United States. Mr. Perez was thus defending himself by securing Tovar Pupo to sign a plea contrary to the best interests of Tovar-Pupo.

A real conflict with the person of an attorney is a major conflict that this Court should consider in deciding that Tovar Pupo has the right to disallow his plea and go back to trial. This is not a mere potential conflict, but a real conflict that should have taken Mr. Perez to recuse himself as Tovar Pupo's counsel and led Tovar Pupo to decide about going into trial without any influence, even a subtle influence, to make defendant sign a plea.

In this case, that of Tovar Pupo, there was even a collusion between
Mr. Perez and the US Government. The US Government's involvement in the Colombian
civil war was and is still being kept secret about its extension and profundity.
The US Government also had a lot of skeletons in its closet about such involvement.
In this sense, there was and is common interest with Mr. Perez in keeping
silent and secret all that was transpiring in Colombia.

There was a common interest in making Tovar Pupo sign a plea admitting
drug trafficking to avoid the real reasons that would have come forward in
a trial whereas Tovar Pupo would have witnessed all about what was his role
with the self-defense groups, in particular ACCU.

His lack of involvement  with drug dealing and could have called witnesses
even from US Government to demonstrate his lack of involvement in drug trafficking,
but would have exposed the involvement of Mr. Perez and US Government in the
fighting going on in Colombia. Mr. Perez was afraid of being found guilty
at some point in the future about his involvement in the Colombian war as
well as the US Government was afraid of exposing the involvement of some of
its agencies in the Colombian civil war. This is a major conflict of interest
so important that it should make this Court to call for an evidentiary hearing
and allow Tovar Pupo to bring witnesses and to open a discovery of evidence
so Tovar Pupo would get all the pertinent documents showing he was not guilty
of drug trafficking and thus, allowing him to diallow his plea agreement and
come to trial. The US Government should drop all charges of drug trafficking
to Tovar Pupo because the US Government, through its prosecutors had evidence
of his lack of involvement. This is by itself a Brady violation so incredible
that just for this Tovar Pupo should be granted a trial for him to demonstrate
his innocence of drug trafficking.

A Brady violation of this magnitude deserves that he should get an evidentiary

hearing and a trial by jury.

At the time when he signed the plea, Tovar Pupo was under duress from Mr. Perez and the US Government, alone and without real counsel about his rights and not really knowing his rights under US Constitution regarding Due Process as guaranteed under the 14th Amendment to EVERYONE on US soil-- legal residents, citizen or not. Due Process is the cornerstone of all our legal system and sets the US above most other societies in respecting human rights of those accused by government to avoid abuses of power against the power of the State and avoid totalitarianism.

Tovar Pupo had and has the right to due process of law and not be a victim of international secrecy disregarding his individual human rights to make US Government look good or at least not as guilty about the Colombian War.

There is also a strong link between the way that US Government uses a plea agreement and the 5th Amendment against self-incrimination. Lately it seems that plea agreements are looked at as something even trivial because we have lost the reality that it goes against the safeguard of self-incrimination. The 5th Amendment was placed there to avoid at all costs government pressuring defendants or people under investigations to self-incriminate. Let's remember here that at the beginning of our Republic, there was a strong link between the 4th and 5th Amendment. Only contraband was allowed to be seized at those times not any self-incriminating papers to protect people from using statements that would self-incriminate them. This has already been lost and now it seems that self-incrimination is used at every level of our judicial system. Let's at least never let due process become what self-incrimination has become. Let's guard defendant's against abuses of our government specifically for international secrecy that later in history would be found despicable.

This Court has the duty of safeguarding Tovar Pupo's due process rights now. In a landmark decision written by Judge Hamilton in the 7th Circuit,

a decision that should have been written at the US Supreme Court level to
make it the law of the land, Judge Hamilton set straight the uses of inference
of a judge coming from evidence against a defendant. Judge Hamilton (U.S.
v. Garcia, 7th Cir. April 2019) states that judges should at least look at
that evidence as they would look evidence in a Civil Summary Judgment Motion
with with the skepticism needed to only allow incontrovertible evidence to
rule in law a summary judgment and moreso in a criminal case whereas the life
and liberty of a person is at stake.

   PSIs are full now of "relevant conduct" and pleas signed under duress
and should be looked at with suspicion from the Court and be absolutely sure
that the defendant pleads guilty to the CHARGES that he is pleading guilty
to. Especially here where Mr. Tovar Pupo consistently said hundreds of times
that he was NOT GUILTY of any drug trafficking but was doing his duty under
his thinking at the time for the benefit of his fellow citizens in Colombia.

   Mistakenly or not, he was doing his duty of defending citizens against
a civil war that was in a way even instigated by secret geo-political reasons
and even Tovar Pupo was and is one more victim of such a war.

   This Court should let the record become clear and truthful for
Tovar Pupo. Let's do Justice for Tovar Pupo.

(SWORN STATEMENT    )

I was taken into the United States by a decree from Colombian President
Uribe allowing for my extradition. I was totally ignorant of the U.S. Legal
System and did not understand or speak English to be able to understand what
was going on.

Mr. Joaquin Perez, a Cuban-American Attorney from Miami was retained
by my father because Hughes Rodriguez's family in Colombia had contacted my
father by phone. Hughes Rodriguez was Mr. Perez's client.

Since my case was in Washington D.C., Perez retained Ms. Shaner to represent
me in my case. Right from the beginning I protested vehemently my innocence
of drug dealing. I told Mr. Perez, Ms. Shaner, the Prosecution, and all people
involved in my case that I was not guilty of drug trafficking and that I never
was dealing with drugs while being a member of the defense group in Colombia
or at any other time. Mr. Perez knew this, the Prosecutors knew this, and
I even informed the Judge in my case of this.

I signed the plea under pressure and coercion. Mr. Perez was in a severe
conflict of interest with my defense. He used the names of Hughes Rodriguez,
Salvatore Mancuso and others, telling me that they will perjur themselves
in testimony against me in a trial. I was tired, confused and coerced when
I signed the plea.

Immediately after signing the plea, I wanted to take it back. I was
never happy with that I disregarded it and really wanted to go to trial to
demonstrate my innocence of the drug dealing charges.

I have already been in prison for 11 (eleven) years, and I keep fighting
this and want to withdraw my plea because it is FALSE. I would never agree
to declare myself guilty of drug trafficking because I was never involved
in drug trafficking.

CONCLUSION

Petitioner has listed six grounds in his 2255 Petition:

Ground One: Violation of Defendant's Sixth Amendment Rights because his attorney
had a conflict of interest and the Court disregarded the conflict as unharmful.
Attorney failed to recuse himself from representing defendant, incuring the
ineffective counseling. Defendant demonstrated here that attorney had even
personal conflict with Defendant. This is the base of everything else. If
the attorney would have recused himself or the Court would have Ordered the
the attorney to cease representing the defendant, then defendant would have
NEVER signed a plea contrary to his wishes and reality. Defendant still claims
he is and was NOT GUILTY of drug trafficking towards the United States.

REMEDY: The Defendant asks that the Court Order an Evidentiary Hearing leading
to the disallowance of his plea agreement and thus pleading NOT GUILTY to
the charge of drug trafficking.


Ground Two: Defendant claims that attorneys should have presented at the beginning
of Defendant's arraignment a Motion for lack of Jurisdiction. By not doing
this, attorney incurred an ineffective counseling that resulted in a very
bad conflict of interest and got Defendant to sign a plea.

REMEDY: The Defendant asks that the Court Order an Evidentiary hearing leading
to the disallowance of his plea agreement and thus pleading NOT GUILTY to
the charge of drug trafficking.


Ground Three: Violation of Defendant's 6th Amendment Rights as explained in
this Brief in detail as attorney failed to argue about Defendant wanting to
withdraw his plea, incurring the ineffective counsel. And the Court violated
his rights by not allowing Defendant to withdraw his plea.

31

REMEDY: The Defendant asks that the Court Order an Evidentiary hearing leading to the disallowance of his plea agreement and thus pleading NOT GUILTY to the charge of drug trafficking.

Ground Four: Ineffective Assistance of Counsel for Attorney allowing, without objection, the PSR's lies about his involvement in drug trafficking when attorney knew, by his own knowledge, that Defendant was never involved in drug trafficking.

REMEDY: The Defendant asks that the Court Order an Evidentiary hearing leading to the disallowance of his plea agreement and thus pleading NOT GUILTY to the charge of drug trafficking.

Ground Five: Attorney coerced the Defendant psychologically into signing the plea agreement, against his own volition.

REMEDY: The Defendant asks that the Court Order an Evidentiary hearing leading to the disallowance of his plea agrement and thus pleading NOT GUILTY to the charge of drug trafficking.

Ground Six: Attorney failed again incurring ineffective counseling by not presenting that Defendant was not guilty as charged of drug trafficking.

REMEDY: The Defendant asks that the Court Order an Evidentiary hearing leading to the disallowance of his plea agreement and thus pleading NOT GUILTY to the charge of drug trafficking.

Further, Defendant pleads the Court to:
1) Open, granting defendant's motion to reopoen discovery.

2) Call for an evidentiary hearing;

3) Allow Defendant to withdraw his guilty plea;

4) Allow defendant to plead NOT GUILTY to charges of drug trafficking.


Submitted today __10__ of __July_____ of 2019.


Respectfully Submitted,

_Rodrigo Tovar Pupo_
Rodrigo Tovar-Pupo



SENDER: COMPLETE THIS SECTION

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

United States
District Court
333 Constitution AVE NW
Washington, DC 20001

9590 9402 2456 6249 9124 08

2. Article Number (Transfer from service label)

COMPLETE THIS SECTION ON DELIVERY

A. Signature
X
☐ Agent
☐ Addressee

B. Received by (Printed Name) RECEIVED Mail Room
C. Date of Delivery

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

JUL 1 5 2019

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2015 PSN 7530-02-000-9053

Domestic Return Receipt

USPS TRACKING #

9590 9402 2456 6249 9124 08

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

United States
Postal Service

• Sender: Please print your name, address, and ZIP+4® in this box•

Rodrigo Tovar Pupo, Reg Nº 80517-004
Low Federal Correction Institution-
Allenwood.
P.O. Box 1.000
White Deer, PA 17887

LA·04

U.S. Postal Service™
CERTIFIED MAIL® RECEIPT
Domestic Mail Only

For delivery information, visit our website at www.usps.com®.

Certified Mail Fee
$3.50

Extra Services & Fees (check box, add fee as appropriate)
☑ Return Receipt (hardcopy)      $ 2.80
☐ Return Receipt (electronic)      $
☐ Certified Mail Restricted Delivery   $
☐ Adult Signature Required       $
☐ Adult Signature Restricted Delivery $

Postmark
JUL 1 1 2019

Postage
$1.90

Total Postage and Fees
$8.20

Sent To  United States District Court
Street and Apt. No., or PO Box No.  333 Constitution AVE NW
City, State, ZIP+4®  Washington, DC 20001

PS Form 3800, April 2015 PSN 7530-02-000-9047    See Reverse for Instructions

Leave to file granted

*Reggie B. Walton*

US DISTRICT COURT
DISTRICT OF WASHINGTON  DC

August 31, 2020

United States of America

v                                    | Case No. 1:04-CR-00114-9 (RBW)

Rodrigo Tovar Pupo

_____

SECOND REQUEST FOR DOCUMENTS

COMES Defendant/Petitioner Rodrigo Tovar-Pupo acting pro se and files
this Motion with the Court, stating:

1) Petitioner has filed a Motion to Vacate (§2255) with this Court.

2) Petitioner has aked the Court to Grant further Discovery according
to Rule 6 of The Federal Rules for a Motion to Vacate (§2255).

3) Petitioner has requested before that the Government, attorneys Perez
and Shaner, deliver to Petitioner several documents in the hands of Government
and attorneys to him because they are very important documents to be used
in this §2255 Motion and in the event of an evidentiary hearing.

The documents requested are every document in the hands of the government
that could have been used if the Petitioner/Defendant went to trial against him
and,   any exculpatory evidence in the hands of the government.


He is requesting from Mr. Perez and Ms. Shaner the same. He is also asking
for any e-mail, written or recorded conversation/communication between  government
attorneys and Mr. Perez and Shaner in the hands of government and also from
Mr. Perez  and Ms. Shaner.

Respectfully,

08-11-2020

*Rodrigo Tovar Pupo*

Rodrigo  Tovar-Pupo

RECEIVED
Mail Room

AUG 14 2020

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

Leave to file granted

DISTRICT COURT
OF
WASHINGTON D.C.

*Reggie B. Walton*

August 31, 2020

United States of America

v

Case No. 1:04-CR-00114-9 (RBW)

Rodrigo Tovar-Pupo
—————————————

### MOTION ASKING FOR COURT'S HELP
### IN SUBPOENA WITNESSES

COMES Defendant, Rodrigo Tovar-Pupo, pro se, and asks this Court:

1) He filed a Motion under §2255 to Vacate; this is pending in Court.

2) He has asked the Court for an evidentiary hearing about his Motion.

3) Defendant has consistently told the Court that he needs to subpoena witnesses to make further Discovery by presenting interrogatories to them with evidence he needs for his evidentiary hearing.

4) Still he is lacking addresses from certain witnesses that the US Government or attorney Perez should have.

5) Defendant needs to subpoena by the Court the following witnesses:

   1. Heather Shaner, Attorney
   2. Leo Arreguin - Former Director of DEA in the American Embassy of Colombia
   3. Clara Iriarte - paralegal of Attorney Joaquin Perez
   4. Humberto Agredo - Former CIA Agent.
   5. Mr. Kevin - Former DEA Agent of Tovar's case
   6. Robert Feitel, Former U.S. Prosecutor.
   7. Salvatore Mancuso, AKA Mono

Respectfully,

08-11-2020

*Rodrigo Tovar Pupo*

Rodrigo Tovar-Pupo